\*<u>NOT FOR PUBLICATION</u>\*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAWN HANNAH,<br><br>        Plaintiff,<br><br>        v.<br><br>JOHNSON & JOHNSON INC., et al.,<br><br>        Defendants. | Civil Action No. 18-1422 (FLW)<br><br>**OPINION** |
| AMY JOHNSON, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>JOHNSON & JOHNSON INC., et al.,<br><br>        Defendants. | Civil Action No. 18-1423 (FLW) |
| MAUREEN KASSIMALI, et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>JOHNSON & JOHNSON INC., et al.,<br><br>        Defendants. | Civil Action No. 18-5534 (FLW) |

DARREN CARTWRIGHT, *Individually and on Behalf of the Estate of Patricia Cartwright, Deceased*, et al.,

Plaintiffs,

v.

JOHNSON & JOHNSON, et al.,

Defendants.

Civil Action No. 18-5535 (FLW)

SHERRON GAVIN, *Individually and on Behalf of all Distributees of the Estate of Rosalyn Gavin, Deceased*, et al.,

Plaintiffs,

v.

JOHNSON & JOHNSON INC., et al.,

Defendants.

Civil Action No. 18-10319

AMANDA REISING, *Individually and on Behalf of the Estate of Christine Reising, Deceased*, et al.,

Plaintiffs,

v.

JOHNSON & JOHNSON, et al.,

Defendants.

Civil Action No. 18-10320

CYNTHIA GIBSON, *Individually and on Behalf of the Estate of Devin Gibson, Deceased*, et al.,

          Plaintiffs,

          v.

JOHNSON & JOHNSON INC., et al.,

          Defendants.

Civil Action No. 18-14637

---

ELEANOR BARSH, et al.,

          Plaintiffs,

          v.

JOHNSON & JOHNSON, et al.,

          Defendants.

Civil Action No. 18-17103

---

LISA HITTLER, et al.,

          Plaintiffs,

          v.

JOHNSON & JOHNSON INC., et al.,

          Defendants.

Civil Action No. 18-17106

---

TASHAY BENFORD, et al.,

          Plaintiffs,

Civil Action No. 19-5590

v.

JOHNSON & JOHNSON INC., et al.,

Defendants.

LAURA MCCONNELL, et al.,

Plaintiffs,

Civil Action No. 19-9365

v.

JOHNSON & JOHNSON, et al.,

Defendants.

CYNTHIA KANNADY, et al.,

Plaintiffs,

Civil Action No. 19-13476

v.

JOHNSON & JOHNSON, et al.,

Defendants.

**<u>WOLFSON, Chief Judge</u>:**

These matters, twelve of the transferred-member cases in the Johnson & Johnson Talcum Powder Products multidistrict litigation ("MDL"), each come before the Court upon a motion to remand.[1] Due to the common legal questions raised on

---

[1]   Mot. to Remand, ECF No. 65, *Hannah v. Johnson & Johnson, Inc.*, No. 18-1422 (D.N.J. Mar. 5, 2018); Mot. to Remand, ECF No. 83, *Johnson v. Johnson & Johnson,*

these motions, and in the interest of efficiently and fairly managing these cases, the Court decides the twelve pending motions in this Omnibus Opinion.

Because the parties' remand arguments also involve their disputes over personal jurisdiction, this Opinion additionally resolves defendant PTI Royston, LLC's ("PTI Royston") pending Motions to Dismiss for Lack of Personal Jurisdiction.[2] The Opinion further addresses defendant PTI Union, LLC's ("PTI Union") pending Motions to Sever.[3]

---

*Inc.*, No. 18-1423 (D.N.J. Sept. 26, 2018); Mot. to Remand, ECF No. 85, *Kassimali v. Johnson & Johnson, Inc.*, No. 18-5534 (D.N.J. July 25, 2018); Mot. to Remand, ECF No. 73, *Cartwright v. Johnson & Johnson*, No. 18-5535 (D.N.J. July 25, 2018); Mot. to Remand, ECF No. 92, *Gavin v. Johnson & Johnson Consumer Inc.*, No. 18-10319 (D.N.J. Sept. 26, 2018); Mot. to Remand, ECF No. 87, *Reising v. Johnson & Johnson*, No. 18-10320 (D.N.J. Sept. 26, 2018); Mot. to Remand, ECF No. 72, *Gibson v. Johnson & Johnson*, No. 18-14637 (D.N.J. Nov. 1, 2018); Mot. to Remand, ECF No. 77, *Barsh v. Johnson & Johnson*, No. 18-17103 (D.N.J. Jan. 9, 2019); Mot. to Remand, ECF No. 66, *Hittler v. Johnson & Johnson, Inc.*, No. 18-17106 (D.N.J. Jan. 7, 2019); Mot. to Remand, ECF No. 75, *Benford v. Johnson & Johnson*, No. 19-5590 (D.N.J. Mar. 8, 2019); Mot. to Remand, ECF No. 89, *McConnell v. Johnson & Johnson*, No. 19-9365 (D.N.J. May 2, 2019); Mot. to Remand, ECF No. 56, *Kannady v. Johnson & Johnson*, No. 19-13476 (D.N.J. July 5, 2019).

[2]    PTI Royston's Mot. to Dismiss, ECF No. 82, *Hannah*, No. 18-1422 (D.N.J. June 12, 2018); PTI Royston's Mot. to Dismiss, ECF No. 78, *Johnson*, No. 18-1423 (D.N.J. June 12, 2018); PTI Royston's Mot. to Dismiss, ECF No. 79, *Kassimali*, No. 18-5534 (D.N.J. June 12, 2018); PTI Royston's Mot. to Dismiss, ECF No. 68, *Cartwright*, No. 18-5535 (D.N.J. June 12, 2018); PTI Royston's Mot. to Dismiss, ECF No. 86, *Gavin*, No. 18-10319 (D.N.J. July 9, 2018); PTI Royston's Mot. to Dismiss, ECF No. 82, *Reising*, No. 18-10320 (D.N.J. July 9, 2018); PTI Royston's Mot. to Dismiss, ECF No. 78, *Gibson*, No. 18-14637 (D.N.J. Nov. 5, 2018); PTI Royston's Mot. to Dismiss, ECF No. 79, *Barsh*, No. 18-17103 (D.N.J. Jan. 10, 2019); PTI Royston's Mot. to Dismiss, ECF No. 70, *Hittler*, No. 18-17106 (D.N.J. Jan. 11, 2019); PTI Royston's Mot. to Dismiss, ECF No. 81, *Benford*, No. 19-5590 (D.N.J. Mar. 15, 2019); PTI Royston's Mot. to Dismiss, ECF No. 94, *McConnell*, No. 19-9365 (D.N.J. May 8, 2019); PTI Royston's Mot. to Dismiss, ECF No. 51, *Kannady*, No. 19-13476 (D.N.J. July 2, 2019).

[3]    PTI Union's Mot. to Sever, ECF No. 80, *Johnson*, No. 18-1423 (D.N.J. June 12, 2018); PTI Union's Mot. to Sever, ECF No. 81, *Kassimali*, No. 18-5534 (D.N.J. June

In order to discuss these motions in an organized manner, as fully explained and defined in more detail below, the Court groups the plaintiffs in these twelve cases into the following three classes:

(1) Plaintiffs who share citizenship with Defendants Johnson & Johnson ("Johnson & Johnson") and Johnson & Johnson Consumer Inc., f/k/a Johnson & Johnson Consumer Companies, Inc. ("JJCI") (collectively, the "Johnson & Johnson Defendants") or Imerys Talc America, Inc. f/k/a Luzenac America, Inc. ("Imerys");[4]

(2) Plaintiffs who share citizenship with the Defendants PTI Royston, LLC, and PTI Union, LLC, (collectively, "the PTI Defendants"); and

(3) Plaintiffs who do not share citizenship with any defendants.

More specifically, "Class One" plaintiffs include all New Jersey and California citizens. "Class Two" plaintiffs consist of the Missouri citizens in *Johnson*, *Kassimali*, *Gavin*, *Reising*, and *Gibson*; the Florida citizens in *Hittler*; the Georgia citizens in *Johnson*; and Plaintiffs in *Hannah*, *Cartwright*, and *Barsh*. Finally, "Class Three" includes the Missouri citizens in *Hittler*, *Benford*, *McConnell*, and *Kannady*; the Florida citizens in *Johnson*; and plaintiffs who are not citizens of California, Florida, Georgia, New Jersey, or Missouri in *Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, *Hittler*, *Benford*, *McConnell*, and *Kannady*.

---

12, 2018); PTI Union's Mot. to Sever, ECF No. 70, *Cartwright*, No. 18-5535 (D.N.J. June 12, 2018); PTI Union's Mot. to Sever, ECF No. 88, *Gavin*, No. 18-10319 (D.N.J. July 9, 2018); PTI Union's Mot. to Sever, ECF No. 84, *Reising*, No. 18-10320 (D.N.J. July 9, 2018); PTI Union's Mot. to Sever, ECF No. 77, *Gibson*, No. 18-14637 (D.N.J. Nov. 5, 2018); PTI Union's Mot. to Sever, ECF No. 81, *Barsh*, No. 18-17103 (D.N.J. Jan. 10, 2019); PTI Union's Mot. to Sever, ECF No. 74, *Hittler*, No. 18-17106 (D.N.J. Jan. 11, 2019).

[4] Imerys has filed for bankruptcy protection, and as such, these matters are stayed as to Imerys pursuant to the automatic stay imposed as a result of the petition.

For the reasons expressed herein, the Court severs the claims of each plaintiff in Class Three and *Barsh*. Consequently, each of Class Three Plaintiffs and the *Barsh* Plaintiffs must file separate complaints and shall each proceed under a separate civil action number upon payment of the requisite filing fee. All claims against PTI Royston by the Class Three Plaintiffs are dismissed for lack of personal jurisdiction. The claims of those Class Three Plaintiffs who are not citizens of Missouri and do not allege they purchased the products in Missouri are dismissed for lack of personal jurisdiction as to the Johnson & Johnson Defendants.[5] Lastly, all claims of Class One and Class Two Plaintiffs, with the exception of the *Barsh* Plaintiffs, are remanded to Missouri state court for lack of subject matter jurisdiction.

## I.   <u>BACKGROUND</u>

These cases originated in Missouri state court and were removed by the Johnson & Johnson Defendants to federal court. (*See, e.g.*, Compl. 1, ECF No. 1-2, *Johnson*, No. 18-1423 (D.N.J. Oct. 30, 2017); Notice of Removal 2, ECF No. 1, *Johnson*, No. 18-1423 (D.N.J. Oct. 30, 2017).) Thereafter, the United States Judicial Panel on Multidistrict Litigation transferred these matters to this Court to be included in MDL No. 2738, *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation.* (*See, e.g.*, Order of MDL Transfer 1, 3, ECF No. 67, *Johnson*, No. 18-1423 (D.N.J. Feb. 1, 2018).)

---

[5]     In the Order accompanying this Opinion, the Court will separately name each plaintiff in Class Three who must file his or her own complaint.

A.   **The Parties**

1.   **The Plaintiffs**

Nine of the twelve cases are multi-plaintiff actions, asserted collectively by more than sixty plaintiffs from various states. (*See, e.g.*, *Compl.* ¶¶ 2–79 *Johnson*, No. 18-1423 (seventy-eight plaintiffs from thirty-five states); Compl. ¶¶ 2–80, ECF No. 1-2, *Kassimali*, No. 18-5534 (D.N.J. Jan. 4, 2018) (seventy-nine plaintiffs from twenty-two states).) In total, there are 733 plaintiffs, only 80 of whom claim Missouri citizenship; and 11 out-of-state plaintiffs have alleged that they purchased or applied Johnson & Johnson Baby Powder or Shower to Shower (collectively, "the products") in Missouri.[6] The remining 642 plaintiffs, or about 88% of all the plaintiffs that are

---

[6]     Notice of Removal ¶¶ 1–2, ECF No. 1, *Hannah*, No. 18-1422 (D.N.J. Mar. 5, 2018) (one Missouri plaintiff); Notice of Removal ¶ 2, ECF No. 1, *Johnson*, No. 18-1423 (D.N.J. Oct. 30, 2017) (seventy-eight plaintiffs, six from Missouri); Compl. ¶ 33, ECF No. 1-2, *Johnson*, No. 18-1423 (D.N.J. Oct. 30, 2017) (a citizen of Oklahoma alleging she bought and applied the products in Missouri); Notice of Removal ¶¶ 2–3, ECF No. 1, *Kassimali*, No. 18-5534 (D.N.J. Jan. 4, 2018) (seventy-nine plaintiffs, one from Missouri, and one Illinois citizen stating she purchased and applied the products in Missouri); Notice of Removal ¶ 1, ECF No. 1, *Cartwright*, No. 18-5535 (D.N.J. Dec. 8, 2017) (forty plaintiffs, all from Missouri); Notice of Removal ¶ 2 & n.3, ECF No. 1, *Gavin*, No. 18-10319 (D.N.J. Feb. 7, 2018) (eighty-six plaintiffs, one from Missouri, and one Iowa citizen alleging she purchased the products in Missouri); Notice of Removal ¶ 2 & n.3, ECF No. 1, *Reising*, No. 18-10320 (D.N.J. Mar. 7, 2017) (eighty-three plaintiffs, four from Missouri, and one citizen of Texas and one citizen of California alleging to have purchased the products in Missouri); Notice of Removal ¶ 2 & n.2, ECF No. 1, *Gibson*, No. 18-14637 (D.N.J. July 6, 2018) (sixty-four plaintiffs, three from Missouri); Notice of Removal ¶ 1, ECF No. 1, *Barsh*, No. 18-17103 (D.N.J. Aug. 30, 2018) (four plaintiffs, all from Missouri); Notice of Removal ¶¶ 3–4, ECF No. 1, *Hittler*, No. 18-17106 (D.N.J. Aug. 31, 2018) (sixty-four plaintiffs, one from Missouri, and one California citizen alleging she purchased the products in Missouri); Notice of Removal ¶¶ 3–4, ECF No. 1, *Benford*, No. 19-5590 (D.N.J. Nov. 8, 2018) (seventy-two plaintiffs, eight from Missouri, and a California and Wisconsin citizen alleging they purchased the products in Missouri); Notice of Removal ¶¶ 3–4, ECF No. 1, *McConnell*, No. 19-9365 (D.N.J. Dec. 14, 2018) (seventy-seven plaintiffs, five from Missouri, one Iowa citizen alleging she purchased the products from Missouri);

the subject of the instant motions to remand, do not allege any connection to Missouri whatsoever.

Plaintiffs' claims center on the alleged link between ovarian cancer and the use of the talc products. (*See, e.g.*, Compl. ¶¶ 1–2, ECF No. 1-1, *Hannah*, No. 18-1422 (D.N.J. Oct. 27, 2017); Compl. ¶¶ 1–79, ECF No. 1-2, *Johnson*, No. 18-1423 (D.N.J. Oct. 30, 2017); Compl. ¶¶ 1–80, ECF No. 1-2, *Kassimali*, No. 18-5534 (D.N.J. Jan. 4, 2018); Compl. ¶¶ 1–41, ECF No. 1-1, *Cartwright*, No. 18-5535 (D.N.J. Dec. 8, 2017); Compl. ¶¶ 1–87, ECF No. 1-2, *Gavin*, No. 18-10319 (D.N.J. Feb. 7, 2018); Compl. ¶¶ 1–84, ECF No. 1-2, *Reising*, No. 18-10320 (D.N.J. Mar. 7, 2018).) Plaintiffs allege that the products contained known carcinogens, such as asbestos, arsenic, and heavy metals, and that they, or the person whose estate they represent, developed cancer as a result of using the products. (*See, e.g.*, Compl. ¶ 2, ECF No. 1-2, *Gibson*, No. 18-14637 (D.N.J. July 6, 2018).) Plaintiffs further allege that Defendants knew of the potential health effects of exposure to the products and mispresented to consumers, regulators, and the scientific and medical communities the contents of, and health hazard posed by, the products. (*See, e.g.*, Compl. ¶ 2, ECF No. 1-1, *Barsh*, No. 18-17103 (D.N.J. Aug. 30, 2018).)

---

Notice of Removal ¶¶ 3–4, ECF No. 1, *Kannady*, No. 19-13476 (D.N.J. Feb. 22, 2019) (eighty-five plaintiffs, six from Missouri); Compl. ¶¶ 8, 26, ECF No. 1-1, *Kannady*, No. 19-13476 (D.N.J. Feb. 22, 2019) (alleging a Texas and Kansas citizen purchased, applied, and developed cancer in Missouri).

### 2.    The Defendants

The Johnson & Johnson Defendants are both New Jersey corporations with their principal places of business in New Jersey. (Defs.' Answer ¶¶ 70, 72, ECF No. 6, *Hittler*, No. 18-17106 (D.N.J. Aug. 31, 2018).) They are, thus, both New Jersey citizens for the purposes of diversity jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 104 (3d Cir. 2015) ("A corporation is a citizen both of the state where it is incorporated and of the state where it has its principal place of business." (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir.2010))). JJCI manufactured and marketed the products. (Defs.' Answer ¶ 73, *Hittler*, No. 18-17106.)

Imerys, which has filed for bankruptcy, supplied talc for the products manufactured by JJCI. (*Id.* ¶ 75; Notice of Bankruptcy Proceedings 1, ECF No. 1-6, *Kannady*, No. 19-13476 (D.N.J. Feb. 22, 2019).) Imerys is a citizen of Delaware and California. (Imery's Opp'n to Mot. to Remand 3, ECF No. 88, *Hittler*, No. 18-17106 (D.N.J. Feb. 6, 2019).)[7]

The PTI Defendants are both Delaware limited liability companies, (Noland Decl. ¶¶ 5–6, ECF No. 1-2, *Kannady*, No. 19-13476 (D.N.J. Aug. 29, 2018)), and as such, their citizenship—for the purposes of diversity jurisdiction—is determined by the citizenship of their members, *Lincoln Ben. Life Co.*, 800 F.3d at 105. The sole member of both PTI Defendants is another Delaware limited liability company, Broadview Investments, LLC ("Broadview"). (Noland Decl. ¶ 7, *Kannady*, No. 19-

---

[7]    Although these cases against Imerys are stayed because of its pending bankruptcy proceeding, Imerys's citizenship remains important in assessing diversity jurisdiction in these matters.

13476.) Broadview has four members, the Revocable Living Trust of Edward T. Noland, Jr., (the "Revocable Living Trust"), the Edward T. Noland, Jr. Irrevocable Gifting Trust (the "Irrevocable Trust"), the Laura Noland Tarrasch Revocable Trust (the "Revocable Trust"), and the Tarrasch Family Trust (the "Family Trust").[8] (*Id.* ¶ 8.) "[T]he citizenship of a traditional trust is based solely on that of its trustee." *GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 39 (3d Cir. 2018). Edward Noland, Jr., a citizen of Georgia since 2006, is the sole trustee of the Revocable Living Trust. (*Id.* ¶¶ 2, 11.) Kimberly Noland, also a citizen of Georgia since 2006, is the sole trustee of the Irrevocable Trust. (*Id.* ¶ 12.) Grant McKay, a citizen of Florida since 2017, became the sole trustee of the Revocable Trust and the Family Trust on June 6, 2018, and June 11, 2018, respectively. (Tarrasch Decl. ¶¶ 8, 6, ECF No. 1-3, *Kannady*, No. 19-13476 (D.N.J. Aug. 29, 2018); Addendum to Tarrasch Decl. ¶¶ 2–3, ECF No. 74-4, *Kannady*, No. 19-13476 (D.N.J. Dec. 4, 2018).) The parties do not discuss the citizenship of the trustee (or trustees) of the Revocable Trust or the Family Trust before Grant McKay became the sole trustee in 2018, but because neither the Johnson & Johnson Defendants, nor the PTI Defendants, dispute that the PTI Defendants were Missouri citizens before Grant McKay became the

---

[8]     Plaintiffs submit that Laura Tarrasch is a member of Broadview and citizen of Missouri. (Moving Br. 14 n.58, *Johnson*, ECF No. 84, *Johnson*, No. 18-1423 (D.N.J. Sept. 26, 2018).) In support of their position, Plaintiffs rely on an affidavit from Edward Noland, Jr., submitted on behalf of the Johnson and Johnson Defendants, which states that Broadview LLC was formed by him, Carl Oberg, Lee Dickenson, and Laura Tarrasch. (Noland Aff. ¶ 4, ECF No. 78-4, *Johnson*, No. 18-1423 (D.N.J. June 12, 2018).) Plaintiffs' reliance on that affidavit is clearly misplaced, because it does not state that Laura Tarrasch is a *member* of Broadview. In fact, nowhere in the record is there any evidence that Ms. Tarrasch is a trustee of any of the related-trusts.

trustee, the Court assumes the prior trustee of one or both was a Missouri citizen. (*See* Notice of Removal ¶ 7, ECF No. 1, *Cartwright*, No. 18-5535 (D.N.J. Dec. 8, 2018); PTI Defs.' Jan. 17, 2019, Letter 1, ECF No. 118, *Gibson*, No. 18-14637 (D.N.J.); Johnson & Johnson Defs.' Opp'n to Mot. to Remand 1 n.1, ECF No. 104, *Johnson*, No. 18-1423 (D.N.J. Oct. 26, 2018).) Tracing the trustees' citizenships of the PTI Defendants, it is clear that before June 6, 2018, both were citizens of Georgia and Missouri, and that, after June 11, 2018, they were citizens of both Georgia and Florida.[9]

---

[9]     The *Barsh* Plaintiffs contend that Defendants have not sufficiently established the citizenship of the PTI Defendants. First, Plaintiffs challenge Defendant's reliance on declarations from Edward T. Noland, Jr. and Laura Tarrasch that set forth the citizenship of each of the trustees. In the Noland Declaration, he states that he is the trustee of the Revocable Trust and a citizen and resident of Georgia and that Kimberly Noland, the trustee of the Irrevocable Trust, is also a citizen and resident of Georgia.Plaintiffs, however, argue that to prove citizenship, Defendants must submit trust documents or other evidence to support these sworn statements. Plaintiffs point to no case law that would require such evidence, nor do Plaintiffs suggest that Edward Noland, Jr. and Kimberly Noland are not citizens of Georgia. Moreover, Plaintiffs assert that the Tarrasch Declaration is insufficient evidence of Grant McCay's citizenship.Plaintiff argues that (1) Laura Tarrasch, as a board member, is not competent to present evidence of McCay's citizenship and (2) that information in certain public records seems to suggest that McCay is actually a resident and citizen of Missouri. The Court finds both arguments unavailing. First, Plaintiffs have presented no legal authority to support their argument that Defendants are required to obtain statements from the trustees themselves to prove their citizenship. Moreover, while Plaintiffs assert that certain public records establish that McCay is a citizen of Missouri, Plaintiffs fail to attach these documents to their moving papers. Absent such documentation or other credible evidence that McCay is not a citizen of Florida, the Court has no basis to accept that McCay is a citizen of Missouri. Absent contrary evidence, the statements set forth in the Tarrasch Declaration, which are made based on Tarrasch's personal knowledge, are sufficient to establish McCay's Florida citizenship. Finally, the *Barsh* Plaintiffs argue that PTI Union should be considered a citizen of Missouri, because it maintains a principal place of business in Missouri. (Moving Br. 10–11, *Barsh*, No. 18-17103.) In making this argument, however, Plaintiffs conflate the concept of diversity jurisdiction with personal jurisdiction. For the purpose of diversity jurisdiction, PTI

Plaintiffs allege that the PTI Defendants participated in the Johnson & Johnson Defendants and Imerys's conspiracy and processed, bottled, labeled, or distributed the products. (*See, e.g.*, Compl. ¶¶ 11–15, *Hannah*, No. 18-1422; Compl. ¶¶ 96–100, ECF No. 1-1, *Kannady*, No. 19-13476.) Defendants claim that the products were only manufactured by PTI Royston in Georgia, whereas another product, Shimmer Effects, was manufactured by PTI Union in Missouri. (Decker Decl. ¶¶ 6, 8, ECF No. 1-4, *Kannady*, No. 19-13476 (D.N.J. Feb. 22, 2019).)

Just two of the twelve cases that are the subject of these motions name a retailer as a defendant. First, the plaintiff in *Hannah* alleges that Dierbergs Markets, Inc. ("Dierbergs Markets") sold, distributed, and marketed the products, and that it knew, or should have known, that use of the products increased the risk of ovarian cancer. (Compl. ¶¶ 16, 103 *Hannah*, No. 18-1422.) Dierbergs Markets is a Missouri corporation with its principal place of business in Missouri. (*Id.* ¶ 16.) The second defendant-retailer is Schnuck Markets, Inc. ("Schnuck Markets") (Notice of Removal ¶ 8, *Barsh*, No. 18-17103.) Although the *Barsh* Plaintiffs fail to plead any facts related to Schnuck Markets' citizenship, (Compl. 6–13 (Parties Section), *Barsh*, No. 18-17103), none of the parties dispute that it is a citizen of Missouri for the purposes of these motions. The *Barsh* Plaintiffs allege that Defendants "distributed and sold [the products] to retailers and other outlets (such as Defendant Schnuck[] [Markets])." (*Id.* ¶¶ 8–11.)

---

Union's citizenship, as a limited-liability corporation, is determined solely by the citizenship of its members. *See Lincoln Ben. Life Co.*, 800 F.3d at 105.

13

### B.  Plaintiffs' Claims

Every complaint asserts claims of Strict Liability for Failure to Warn, Strict Liability for Defective Manufacture and Design, Negligence, Breach of Implied Warranties, Civil Conspiracy, and Concert of Action against all Defendants. (*See, e.g.*, Compl. ¶¶ 68–100, 109–34, 145–56, *Hannah*, No. 18-1422.) These complaints also assert claims of Breach of Express Warranties and Fraud against the Johnson & Johnson Defendants, and Concealment and Negligent Misrepresentation against Imerys and the Johnson & Johnson Defendants. (*See, e.g.*, *id.* at ¶¶ 140–44, 157–81.) The plaintiffs in all cases, except *Hannah* and *Barsh*, allege Wrongful Death against all named defendants. (*See, e.g.*, Compl. ¶¶ 342–46, *Kannady*, No. 19-13476.) Claims against the Johnson and Johnson Defendants for violation of the Missouri Merchandizing Practice Act, Mo. Ann. Stat. § 407.020, *et seq.*, are present in seven of the twelve cases, and claims specific to Dierbergs Markets are only present in *Hannah*. (*See, e.g.*, Compl. ¶¶ 59–67, 101–08, 135–39, *Hannah*, No. 18-1422.) There are no claims specific to Schnuck Markets in *Barsh*. (*See* Compl. 23–56 (Counts), *Barsh*, No. 18-17103.)

Essentially, Plaintiffs allege that the Johnson & Johnson Defendants knew, or should have known, that talc was carcinogenic when applied to the perineal region, and intentionally misled consumers, advertising the products for use "all over," and failed to disclose the risks of the products. (*See, e.g.*, Compl. ¶¶ 60, 64–65, *Hannah*, No. 18-1422.) Plaintiffs claim that the first association between talc and ovarian cancer was made in 1971, and by 1981 nearly all of the twenty-two epidemiological studies on the subject corroborated the link. (*Id.* ¶¶ 36, 38.) In 1993, Plaintiffs allege,

14

the United States National Toxicology Program published a study finding clear evidence that non-asbestos form talc was carcinogenic. (*Id.* ¶ 39.)

Plaintiffs further aver that, beginning in 2006, Imerys supplied the Johnson & Johnson Defendants and the PTI Defendants with Material Safety Data Sheets that expressly warned of the increased risk of ovarian cancer associated with perineal use of talc. (*Id.* ¶¶ 26, 45.) Plaintiffs allege that PTI Union manufactured, processed, bottled, labeled, and packaged the products and that it disregarded the warning contained in Material Safety Data Sheets and failed to inform the consumer of the products' risks. (*Id.* ¶¶ 28, 30.) As for the Johnson & Johnson Defendants, in addition to allegations that they ignored the Material Safety Data Sheets, Plaintiffs allege that these defendants and Imerys, as members of the Cosmetic Toiletry and Fragrance Association ("CTFA"), formed the Talc Interested Party Task Force ("TIPTF"). The purposes of the organization, Plaintiffs aver, were to hire scientists to perform biased research, edit scientific reports, release false information about the safety of talc, and exercise political and economic influence over regulators, all to prevent the regulation of talc and create consumer confusion about the risk of ovarian cancer. (*Id.* ¶ 40.) Plaintiffs claim that at all relevant times, there was a known alternative to talc with no known health effects, cornstarch, and in 1994 the Cancer Prevention Coalition urged the Johnson & Johnson Defendants to substitute cornstarch. (*Id.* ¶ 22.)

## II.   <u>DISCUSSION</u>

### A. Severing the Complaints Under Rule 21

First, the Court addresses the Motions to Sever brought by PTI Union. Federal Rules of Civil Procedure ("Rules") 18 through 21 govern the joinder of multiple parties and claims into a single action, and vest considerable discretion in the district courts in managing and structuring civil litigation. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 572–73 (2004) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time . . . .") (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989)); *Acosta v. Lounge*, No. 18-17710, 2019 WL 5304156, at *3 (D.N.J. Oct. 18, 2019). Plaintiffs may join together in a single action if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1)(A)–(B). When parties are misjoined, the Court is not at liberty to dismiss the action, but, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21.

In effect, "the court has two remedial options: (1) misjoined parties may be dropped 'on such terms as are just'; or (2) any claims against misjoined parties 'may be severed and proceeded with separately.'" *DirecTV, Inc. v. Leto*, 467 F.3d 842, 845 (3d Cir. 2006) (quoting Fed. R. Civ. P. 21). "When a court 'drops' a defendant under Rule 21, that defendant is dismissed from the case without prejudice." *Id.* (quoting

16

*Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1068 (3d Cir. 1979)). Whereas, "when a court 'severs' a claim against a defendant under Rule 21, the suit simply continues against the severed defendant in another guise." *Id.* (quoting *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 145 n.6 (3d Cir. 1999)). In other words, "if claims are severed pursuant to Rule 21 they 'become independent actions with separate judgments entered in each.'" *White*, 199 F.3d at 145 n.6 (quoting *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1519 n.8 (10th Cir. 1991)).

"Rule 21 is most commonly invoked to sever parties improperly joined under Rule 20." *Lopez v. City of Irvington*, No. 05-5323, 2008 WL 565776, at *2 (D.N.J. Feb. 28, 2008) (quoting *Boyer v. Johnson Matthey, Inc.*, No. 02–8382, 2004 WL 835082, at *1 (E.D. Pa. Apr. 16, 2004) (further quotation omitted)). "Rule 21 may also be invoked to sever the claims of parties otherwise permissively joined pursuant to Rule 20(a) for convenience, to avoid prejudice, or to promote the expeditious resolution of the litigation." *Boyer*, 2004 WL 835082, at *1 n.1; *see also Lopez*, 2008 WL 565776, at *2. Further, district courts may use Rule 21 "to organize problematical issues other than joinder problems." *Official Comm. of Unsecured Creditors v. Shapiro*, 190 F.R.D. 352, 355 (E.D. Pa. 2000) (citing 4 Moore's Federal Practice § 21.02(1) ("The courts have properly concluded that they may issue orders under Rule 21 even in the absence of misjoinder and non-joinder of parties, to construct a case for the efficient administration of justice.")). For example, "[c]ourts frequently employ [Rule] 21 to preserve diversity jurisdiction over a case by dropping a nondiverse party if the party's presence in the action is not required under [Rule] 19." 7 Wright & Miller Federal Practice and Procedure § 1685 (3d ed.).

"Both the same transaction(s) and the common question elements must be satisfied before joinder can be permitted." *Boyer*, 2004 WL 835082, at *2 (quoting *In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. MDL 1014, 1995 WL 428683, at *1 (E.D. Pa. July 17, 1995)). "'[C]ourts generally apply a case-by-case approach' when considering whether the facts of several claims constitute a single transaction or occurrence, or a series of transactions or occurrences." *Lopez*, 2008 WL 565776, at *2 (quoting *Boyer*, 2004 WL 835082, at *5). "'Transaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.'" *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333 (8th Cir. 1974) (quoting *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610 (1926)); *Lopez*, 2008 WL 565776, at *2. The common questions element "does not require precise congruence of all factual and legal issues; indeed, joinder may be permissible if there is but one question of law or fact common to the parties." *Morris v. Paul Revere Ins. Grp.*, 986 F. Supp. 872, 885 (D.N.J. 1997) (quoting *Mesa Computer Utils., Inc. v. W. Union Computer Utils., Inc.*, 67 F.R.D. 634, 637 (D. Del. 1975) (further citations omitted)).

Again, "[t]he decision whether to sever a party or claim from an action is within the broad discretion of the district court," *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y. 1995), and "[o]nce the court has resolved these threshold questions, it may then consider additional factors." *Lopez*, 2008 WL 565776, at *3. That means that, even absent misjoinder, the Court may, in its discretion, sever parties or claims under Rules 20(b) or 21 in the interests of judicial efficiency or to avoid unnecessary expense or delay. *See German by German*,

896 F. Supp. at 1400; *Lopez*, 2008 WL 565776, at *3. "[I]f [the court] determines that the addition of the party under Rule 20 will not foster the objectives of the rule, but will result in prejudice, expense or delay," it may deny joinder. 7 Wright & Miller Fed. Proc. Civ. § 1652 (3d ed.).

> In deciding whether severance is appropriate, courts generally consider (1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*German by German*, 896 F. Supp. at 1400; *accord Demarco v. DIRECTV, LLC*, No. 14-4623, 2015 WL 6525900, at *7 (D.N.J. Oct. 28, 2015); *Picozzi v. Connor*, No. 12-4102, 2012 WL 2839820, at *6 (D.N.J. July 9, 2012).

The Court does not question whether Plaintiffs are properly joined in each action for the purposes of Rule 20, because it appears each claim arises out of the same transaction or occurrence (specifically, Defendants' alleged liability), *see Boyer*, 2004 WL 835082, at *2–3; *Lopez*, 2008 WL 565776, at *4; and indeed, there are issues of fact common between them. Nevertheless, the Court finds good cause to sever Plaintiffs' actions. The joinder of hundreds of plaintiffs in these cases, most of whom lack any connection to Missouri, raises a tangle of jurisdictional issues, which must be addressed on a case-by-case basis. Further, because these cases are collectively managed for pretrial purposes as a MDL, the benefits of joinder are reduced, and severance will aid the Court in the just administration of these actions. Furthermore, each Plaintiff will require individualized causation analyses and damage

assessments. The Court, thus, in its discretion under Rule 21, and exercising its inherent power to manage its caseload, control its docket, and "control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants," *Picozzi*, 2012 WL 2839820, at *6 (quoting *United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936))); *see also Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 564, 567 (3d Cir. 1985); *In re Benicar (Olmesartan) Prod. Liab. Litig.*, 198 F. Supp. 3d 385, 386 (D.N.J. 2016) (noting this Court ordered multi-plaintiffs' complaints to be severed), will sever each plaintiff's claims from the multi-plaintiffs' complaints, and treat each individual plaintiff separately for the analyses in this Opinion.

### B.    Removal Jurisdiction

Because the Court decides whether remand is appropriate based on the citizenship of each separate plaintiff, as discussed *supra*, the Court has categorized them into three classes, since the legal questions raised in each class are identical: (1) plaintiffs who share citizenship with the Johnson & Johnson Defendants or Imerys; (2) plaintiffs who share citizenship with the PTI Defendants; and (3) all plaintiffs who do not share citizenship with any defendants. More specifically, because the Johnson & Johnson Defendants are New Jersey citizens and Imerys is a California citizen, the first class consists of all of the New Jersey and California Plaintiffs. Because the PTI Defendants were citizens of Missouri and Georgia before June 6, 2018, and were citizens of Florida and Georgia after June 11, 2018, the second class is composed of all Missouri Plaintiffs who filed their action before June 6, 2018, all Florida Plaintiffs who filed their action after June 6, 2018, and all Georgia

Plaintiffs. The third class consists of all Missouri Plaintiffs who filed their action after June 6, 2018, all Florida Plaintiffs who filed their action before June 6, 2018, and all Plaintiffs who are not citizens of California, Florida, Georgia, New Jersey, or Missouri, because those plaintiffs do not share citizenship with any of the defendants. The only exceptions are the *Barsh* Plaintiffs, because the addition of Schnuck Markets, a Missouri citizen, brings them in line with Class Two plaintiffs. Having categorized these Plaintiffs, the Court determines subject matter jurisdiction over each class's claims, in turn.

A defendant may remove a civil action filed in state court if the federal court has original jurisdiction to hear the matter. 28 U.S.C. § 1441(a). The district courts have original jurisdiction over civil actions where there is complete diversity of citizenship between the plaintiffs and defendants, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a); *Grand Union Supermarkets of the Virgin Islands, Inc. v. H.E. Lockhart Mgmt., Inc.*, 316 F.3d 408, 410 (3d Cir. 2003). "Complete diversity" means "no plaintiff can be a citizen of the same state as any of the defendants." *Id.* Additionally, the "forum defendant rule" prohibits removal based on diversity where a defendant is a citizen of the state forum. 28 U.S.C. § 1441(b)(2); *McBride v. Johnson & Johnson*, No. 16-7891, 2017 WL 4570289, at *4 (D.N.J. Oct. 12, 2017). "Diversity of citizenship must have existed at the time the complaint was filed, and at the time of removal, and the burden is on the removing party to establish federal jurisdiction." *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 346 (3d Cir. 2013) (internal citations omitted) (citing *Grand Union Supermarkets*, 316 F.3d at 410; *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1985)). After a

case has been removed, the district court may remand it to state court if the removal was procedurally defective or subject matter jurisdiction is lacking. 28 U.S.C. § 1447(c).

    **1.**    **Class One: Defendants Who Share Citizenship with the Johnson & Johnson Defendants or Imerys**

Nine of the twelve cases, *Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, *Hittler*, *Benford*, *McConnell*, and *Kannady*, include Plaintiffs who are citizens of California or New Jersey. As stated above, the New Jersey Plaintiffs share citizenship with the Johnson & Johnson Defendants and the California Plaintiffs share citizenship with Imerys. The Johnson & Johnson Defendants do not challenge this Court's subject matter jurisdiction over the Class One Plaintiffs, but rather they argue that the Court lacks personal jurisdiction over them with respect to the Class One Plaintiffs' claims.

The Johnson & Johnson Defendants urge that the Court consider their personal jurisdiction question first with respect to the Class One Plaintiffs, before remanding their claims to state court. However, with respect to these cases, the Court clearly lacks subject matter jurisdiction. While this Court may, in an appropriate case, decide issues of personal jurisdiction before deciding the propriety of removal, this sequence is the exception, not the rule: courts should ordinarily determine questions concerning removal before addressing personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 436 (2007); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 586–88 (1999). On this issue, the Supreme Court specifically cautioned that "in most instances subject-matter jurisdiction will involve no arduous inquiry," and that "[i]n such cases, both expedition and sensitivity to state

22

courts' coequal stature should impel the federal court to dispose of that issue first."
*Ruhrgas*, 526 U.S. at 587–88. Simply put, a court may dispense with deciding the
propriety of removal and skip straight to personal jurisdiction *only* when faced with
a difficult or perplexing question concerning removal and a simple or straightforward
matter concerning personal jurisdiction. *See id.*

Here, it is clear on the face of the complaints that the Court lacks diversity
jurisdiction over the Class One Plaintiffs, since they are either New Jersey or
California residents, who share the same citizenship with the Johnson & Johnson
Defendants and Imerys. As such, these are not the exceptional cases that would
warrant skipping the removal inquiry in order to decide questions of personal
jurisdiction. "Given the simplicity of the removal inquiry and the intricacy of the
personal jurisdiction question [involved in these matters], th[e] Court must follow the
Supreme Court's command to first adjudicate . . . [the] motion[s] to remand." *Scott v.
Brenntag N. Am., Inc.*, No. 19-335, 2019 U.S. Dist. LEXIS 148543, at *7 (D.N.J. Aug.
29, 2019).

Because of the lack of complete diversity between the New Jersey and
California Plaintiffs and the Johnson & Johnson Defendants and Imerys, the Court
must remand their cases for lack of subject matter jurisdiction. The Johnson &
Johnson Defendants and Imerys may challenge personal jurisdiction and/or venue
questions in state court, if appropriate.

2.    **Class Two: Defendants Who Share Citizenship with the PTI Defendants or Schnuck Markets**

Eight of the cases, *Hannah*, *Johnson*, *Kassimali*, *Cartwright*, *Gavin*, *Reising*, *Gibson*,[10] and *Hittler*, involve Plaintiffs who share citizenship with the PTI Defendants.[11] Additionally, while *Barsh*, which involves four Missouri Plaintiffs, was filed after June 6, 2018, (Compl. ¶¶ 8–11, *Barsh*, No. 18-17103), the Court will consider the *Barsh* Plaintiffs alongside the Class Two Plaintiffs due to the addition of Schnuck Markets, a Missouri retailer. (*Id.* at 2 (caption and petition).)

The Johnson & Johnson Defendants raise two arguments regarding the PTI Defendants: first, PTI Union has been fraudulently joined because it only manufactured Shimmer Effects. Second, PTI Royston has been fraudulently joined because it is immune from liability under Missouri's contract specifications defense. (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 10, 19–20, 29, 37, *Johnson*, No. 18-1423.)

---

[10]    While *Gibson* was removed after June 6, 2018, the case was filed on June 1, 2018, (Compl. 1, *Gibson*, No. 18-14637), and the PTI Defendants' change in citizenship after filing does not create diversity. *See Johnson*, 724 F.3d at 346; *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 62 (1996) (discussing 28 U.S.C. § 1441(a)–(b)). The three Missouri Plaintiffs in *Gibson* thus fall into Class Two with the other Missouri Plaintiffs whose actions were filed before June 6, 2018.

[11]    More specifically, all of those actions, except *Hittler*, involve Missouri Plaintiffs and were filed in state court before June 6, 2018. *Hittler* was filed after June 6, 2018, and includes two Florida Plaintiffs. (Compl. ¶¶ 10, 50, ECF No. 1-1, *Hittler*, No. 18-17106 (D.N.J. Aug. 31, 2018).) *Johnson* includes three Georgia Plaintiffs. (Compl. ¶¶ 16, 48, 63, *Johnson*, No. 18-1423.)

### a.   *Standard for Fraudulent Joinder and Missouri's Contract Specifications Defense*

#### i.   *Fraudulent Joinder*

"An exception to the requirement that removal be based solely on complete diversity is the doctrine of fraudulent joinder." *Abbedutto v. Johnson & Johnson*, No. 17-5724, 2019 WL 3245105, at *2 (D.N.J. July 19, 2019) (citing *In re Briscoe*, 448 F.3d 201, 215–16 (3d Cir. 2006)); *see also Brown v. Jevic*, 575 F.3d 322, 326 (3d Cir. 2009) ("Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right." (quoting *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907))). "Joinder is fraudulent where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment." *In re Briscoe*, 448 F.3d at 217 (quoting *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851–52 (3d Cir. 1992) (further citations omitted)). A heavy burden of persuasion is on the removing party to demonstrate fraudulent joinder, and "if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Id.* (quoting *Batoff*, 977 F.2d at 851).

When determining whether a defendant has been fraudulently joined, the court must consider "the plaintiff's complaint at the time the petition for removal was filed" and "must assume as true all factual allegations of the complaint." *Id.* (quoting *Batoff*, 977 F.2d at 852). Any doubts about the controlling law must be resolved in

favor of the plaintiffs. *Id.* (quoting *Batoff*, 977 F.2d at 852). "[A] court's determination of fraudulent joinder does not focus on whether plaintiff's claims are 'plausible' under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or Rule 12(b)(6), rather it focuses on whether they are more than 'frivolous.'" *Abbedutto*, 2019 WL 3245105, at *2 (citing *In re Briscoe*, 448 F.3d at 218; *Batoff*, 977 F.2d at 852). Even if a party fails to state a claim against a defendant, that does not necessarily mean that defendant was fraudulently joined. *Id.* at *3.

### ii. <u>*Missouri's Contract Specification Defense*</u>

Under Missouri state law, "a contractor's compliance with its customer's plans and specifications is, with limited exceptions . . . , a complete defense to strict liability and negligence claims based on defective design." *Bloemer v. Art Welding Co.*, 884 S.W.2d 55, 56 (Mo. Ct. App. 1994). This defense "shields a manufacturer from liability for injuries caused by a design defect in products it manufactures pursuant to plans and specifications supplied by the purchaser." *Hopfer v. Neenah Foundry Co.*, 477 S.W.3d 116, 124 (Mo. Ct. App. 2015) (quoting 2 Owen & Davis on Prod. Liab. § 14:2 (4th ed.)). For example, in *Gast v. Shell Oil Co.*, 819 S.W.2d 367, 370 (Mo. 1991), the Supreme Court of Missouri held that a contractor could not be "faulted for" the design of a door "because the specifications directed that this be done." *Id.* An exception to that defense exists "with respect to defective construction, inherently dangerous to others, in a situation where the defects are known to the contractor but not detectable upon careful inspection by the owner accepting the work." *Bloemer*, 884 S.W.2d at 58. That defense has been extended to products liability cases. *Id.*

As to the parameters of that defense, the Missouri Court of Appeals has opined that "absent evidence that the owner was relying on the contractor's expertise as to the proper design of the modification," the contractor could not be held liable. *Id.* at 60 (citing *Gast*, 819 S.W.2d at 371). The court went on to explain, however, that "to impose liability for failure to suggest revisions to the customer's design necessarily presupposes a duty to evaluate the adequacy and safety of the customer's specifications," and "absent some glaring deficiency in the specifications provided, the contractor owes no such duty." *Id.*

Consistent with that view, manufacturers cannot be exempt from liability where there is a glaring defect, such as, suggested by Plaintiffs here, the failure to warn of the allegedly known carcinogenic properties of the talc. *See, e.g., Spangler v. Kranco, Inc.*, 481 F.2d 373, 375 (4th Cir. 1973) ("We find additional support for the action of the district judge in the principle that the products liability rule holding a manufacturer liable does not apply where the product has been manufactured in accordance with the plans and specifications of the purchaser except when such plans are so obviously dangerous that they should not reasonably be followed.") (citing *Littlehale v. E. I. du Pont, etc. & Co.*, 268 F. Supp. 791, 802 n.16, (S.D.N.Y.1966), *aff'd*, 380 F.2d 274 (2d Cir. 1967)); *see also Moon v. Winger Boss Co.*, 205 Neb. 292, 299–300 (1980) ("[A] manufacturer is not liable for injuries to a user of a product which it has manufactured in accordance with plans and specifications of one other than the manufacturer, except when the plans are so obviously, patently, or glaringly dangerous that a manufacturer exercising ordinary care under the circumstances then existing would not follow them."); 2 Owen & Davis on Prod. Liab. § 14:2 (4th ed.)

("This widely accepted principle is described in the *Restatement Second, Torts*, which provides that an independent contractor 'is not required to sit in judgment on the plans and specifications or the materials provided by his employer' and is not liable for their insufficiency unless the design or materials specified 'is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe.'" (quoting Restatement Second, Torts § 404, comment a) (footnotes omitted))). In such situations, "it is incumbent upon Plaintiffs, not Defendants, to come forward with proof that would support a finding that the specifications provided were so obviously deficient that a competent contractor would have recognized the danger." *Bloemer*, 884 S.W.2d at 59.

### b. Plaintiffs' Claims against the PTI Defendants Are Not Frivolous Under Missouri's Contract Specifications Defense

The Court begins with whether the contract specifications defense is legally dispositive of the PTI Defendants' liability and, consequently, whether they were fraudulently joined. The Johnson & Johnson Defendants' arguments focus on the contract specifications defense solely as applied to PTI Royston,[12] (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 37–46, *Johnson*, No. 18-1423), but the PTI Defendants join with their own opposition, adding "both [PTI] Royston and [PTI] Union are exempt from liability under the contract specifications defense," (PTI

---

[12]    I note that the Johnson & Johnson Defendants' fraudulent joinder argument as it relates to PTI Royston relies only on the contract specifications defense, which acts as "a complete defense to strict liability and negligence claims." *Hopfer*, 477 S.W.3d at 125.

Royston's Opp'n to Mot. to Remand 2, ECF No. 111, *Johnson*, No. 18-1423 (D.N.J. Oct. 26, 2018); PTI Union's Opp'n to Mot. to Remand 2, ECF No. 112, *Johnson*, No. 18-1423 (D.N.J. Oct. 26, 2018)). Additionally, PTI Royston and PTI Union discuss the applicability of this affirmative defense in their briefs in support of their respective Motions to Dismiss. (PTI Royston's Moving Br. 18–21, ECF No. 78-1, *Johnson*, No. 18-1423 (D.N.J. June 12, 2018); PTI Union's Moving Br. 11–13, ECF No. 79-1, *Johnson*, No. 18-1423 (D.N.J. June 12, 2018).)

The Johnson & Johnson Defendants argue that "Plaintiffs' own allegations demonstrate that this 'complete defense' forecloses their claims against [the PTI Defendants]," because Plaintiffs allege the PTI Defendants "act[ed] at the direction of or on behalf of the Johnson & Johnson Defendants." (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 39, *Johnson*, No. 18-1423 (quoting Compl. ¶ 92, *Johnson*, No. 18-1423).) The PTI Defendants echo that argument, adding only that "it would be contrary to public policy to impose liability on contract manufacturers who have merely provided a product pursuant to the plans and specifications" and "[i]mposing such liability would, for example, require contract manufacturers to scrutinize the chemistry and labeling of the product." (PTI Royston's Moving Br. 20–21, *Johnson*, No. 18-1423; PTI Union's Moving Br. 12, *Johnson*, No. 18-1423.) In response, Plaintiffs contend that under Missouri law, it is premature to assess the applicability of the affirmative defense, and the Court must wait until the close of discovery. (Moving Br. 57–58, ECF No. 84, *Johnson*, No. 18-1423 (D.N.J. Sept. 26, 2018).) Moreover, Plaintiffs maintain that there is a genuine issue as to whether the defense applies here because (1) they have pleaded that the PTI Defendants received express

warnings that talc could cause ovarian cancer and (2) that certain of their claims do not fall into the defense because they allege that the PTI Defendants conspired to conceal and suppress the risk of ovarian cancer and that the PTI Defendants defectively manufactured the products. (*Id.* at 56–59.)

As a matter of fraudulent joinder, Missouri case law sides with Plaintiffs' position. I start with the principle that any doubts as to the state of the governing law must be resolved in favor of remand, *In re Briscoe*, 448 F.3d at 217 (quoting *Batoff*, 977 F.2d at 851–52), and it appears Missouri courts would likely hold a manufacturer liable for an obviously dangerous design defect, such as the alleged failure to warn of known carcinogens in a particular product. *See Hopfer*, 477 S.W.3d at 124–125 & n.4 (citing 2 Owen & Davis on Prod. Liab. § 14:2 (4th ed.)); *Spangler*, 481 F.2d at 375; *Moon*, 205 Neb. at 299–300; 2 Owen & Davis on Prod. Liab. § 14:2 (4th ed.). Here, Plaintiffs allege that Imerys "supplied its customers, including . . . Defendant PTI Union, LLC, and Defendant PTI Royston, LLC with Material Safety Data Sheets," which they allege expressly "warned those receiving the talc, to include . . . PTI Union, LLC, and Defendant PTI Royston, LLC of the ovarian cancer hazard associated with perineal talc use, an intended use of the [products]." (Compl. ¶¶ 102–103, *Johnson*, No. 18-1423.) More specifically, Plaintiffs allege "in or about 2006, [Imerys] began placing a warning on the [Material Safety Data Sheets] it provided to the Johnson & Johnson Defendants, PTI Union, LLC and/or PTI Royston, LLC regarding the talc it sold to them for use in the [products]," which "not only provided the warning information about the [International Agency for Research on Cancer's] classification but also included warning information regarding 'States Rights to

Know' and warning information about the Canadian Government's D2A classification of talc." (*Id.* ¶ 122.) They further allege PTI Union "disregard[ed] the warning, and process[ed], bottle[d], mislabel[ed], mispackage[d], and distribute[d], without warning . . . thereby creating the dangerous condition of the product . . . ." (*Id.* ¶ 105.)

Whether the evidence will prove true Plaintiffs' allegations, however, is not before the Court on a fraudulent joinder analysis. In this context, the Court merely considers whether the pleadings assert a non-frivolous claim. *Abbedutto*, 2019 WL 3245105, at *2 (citing *In re Briscoe*, 448 F.3d at 218; *Batoff*, 977 F.2d at 852). On their face, Plaintiffs' pleadings assert a claim that would fall outside of the contract specifications defense. *See Bloemer*, 884 S.W.2d at 58. Accordingly, the Court cannot find that there is no "possibility that a state court would find that the complaint states a cause of action," *In re Briscoe*, 448 F.3d at 217 (quoting *Batoff*, 977 F.2d at 851–52), against the PTI Defendants.

Alternatively, the Court cannot rely on the contract specification defense as a basis for finding that the PTI Defendants were fraudulently joined, because under Missouri law, the applicability of an affirmative defense should not be resolved on a motion to dismiss. Rather, the defense should be raised on a motion for summary judgment, after discovery has taken place. *See Evans v. Empire Dist. Elec. Co.*, 346 S.W.3d 313, 317 (Mo. App. W.D. 2011) ("Affirmative defenses must be pleaded and proved as provided in Rules 55.08 and 55.27. It is not a defense that may be raised in a motion to dismiss." (citation and quotations omitted)); *Fortenberry v. Buck*, 307 S.W.3d 676, 679 (Mo. App. W.D. 2010) (advising that a pre-trial dismissal based on an affirmative defense must be granted under the standards of summary judgment).

31

In that regard, on a fraudulent joinder analysis, it would be premature for this Court to decide the issue of the contract specification defense in the first instance.

Accordingly, the Class Two Plaintiffs in *Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, and *Hittler* shall be jointly remanded with the Class One Plaintiffs.[13] *Hannah* and *Cartwright*, which only involve Missouri Plaintiffs, are also remanded.[14] While the Court need not address Plaintiffs' remaining arguments as to the contract specifications defense, the Court's inquiry does not end here, because the Johnson & Johnson Defendants and the PTI Defendants further argue that PTI Union is fraudulently joined for another reason:[15] that PTI Union only manufactured Shimmer Effects, a product Plaintiffs have not alleged they used.

### c.   *PTI Union Is Fraudulently Joined*

In their Complaints, Plaintiffs allege that PTI Union manufactured and labeled, "or controlled and directed" manufacture and labeling of, the products and that it discarded and ignored Imerys's Material Data Safety Data Sheets warning of

---

[13]   Since the Court is remanding the claims of Class Two Plaintiffs, for the same reasons explained above with respect to Class One Plaintiffs, I do not address PTI Royston's personal jurisdiction arguments in the context of this class of plaintiffs. PTI Royston may renew its motion to dismiss in Missouri State Court following remand.

[14]   Because *Hannah* is remanded to Missouri state court based on the lack of diversity between Plaintiffs and PTI Royston, *see infra*, I need not analyze the issue of whether Dierbergs Markets, a Missouri retailer, was fraudulently joined.

[15]   I note that the claims of the Class Two Plaintiffs are remanded even if PTI Union is fraudulently joined, because of the inclusion of the in-state defendant PTI Royston. However, the citizenship of PTI Union will impact the claims of the Class Three Plaintiffs, and as such, the Court must address fraudulent joinder as to PTI Union.

the risk of ovarian cancer without including that warning on the packaging. (Compl. ¶¶ 102–03, 105–07, *Johnson*, No. 18-1423.) They further allege that PTI Union, as a manufacturer, knew, or should have known, that talc used in the products was carcinogenic and failed to provide consumers adequate warning. (*Id.* ¶¶ 163–63.) Plaintiffs further claim that there was a known noncarcinogenic alternative, cornstarch. (*Id.* ¶ 190.) It is upon these facts that Plaintiffs base their claims against PTI Union of Strict Liability for Failure to Warn, Strict Liability for Defective Manufacture or Design, Negligence, and Breach of Implied Warranties.

Plaintiffs also allege, as to all Defendants, that they "knowingly agreed, contrived, confederated and conspired to deprive the Plaintiffs of the opportunity of informed free choice as to whether to use the [products] or to expose themselves to the stated dangers." (*Id.* ¶ 213.) More specifically, Plaintiffs aver that Defendants, including PTI Union: (1) "as part of the [TIPTF], corresponded about and agreed to edit and delete portions of scientific papers being submitted on their behalf to the United States Toxicology Program"; (2), "through the TIPTF, used their influence over the National Toxicology Program ("NTP["]) Subcommittee and the threat of litigation against the NTP to prevent the NTP from classifying talc as a carcinogen"; (3) "through the TIPTF, collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994." (*Id.* ¶ 214.) Based upon those allegations, Plaintiffs assert claims of Civil Conspiracy and Concert of Action against all Defendants.

The elements of a cause of action for strict liability for failure to warn under Missouri law are:

> (1) the defendant sold the product in question in the course of its business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) the defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. 2011). The parties' arguments center on the first element. The Johnson & Johnson Defendants argue that Plaintiffs "lack a colorable claim against PTI Union because it manufactured a distinct product, Shimmer Effects, and there is no allegation that any plaintiff ever purchased Shimmer Effects, much less that any plaintiff was sufficiently exposed to that product such that it could have been a cause of injury." (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 12, *Johnson*, No. 18-1423.)

On the other hand, Plaintiffs allege that PTI Union and PTI Royston operated jointly as Pharma Tech Industries, Inc., ("Pharma Tech") a Missouri corporation, and that both processed, packaged, labeled, and distributed the products, other than Shimmer Effects.[16] (Moving Br. 6 & n.9, *Johnson*, No. 18-1423.) However, in their briefing, Plaintiffs appear to acknowledge that PTI Union only "manufactured one of the varietals of the Products, Shower to Shower Shimmer Effects . . . ." (*Id.* at 14–15.)

---

[16]    The Court notes that Pharma Tech is not a defendant in these actions nor does it exist as a functioning entity. Nevertheless, Plaintiffs continuously refer to Pharma Tech as if it were in operation. Wading through their convoluted arguments, it appears that Plaintiffs' position is that PTI Union is the successor of Pharma Tech such that PTI Union has assumed all of the business activities that Pharma Tech once conducted, which includes directing and overseeing PTI Royston's manufacturing sector.

34

But, Plaintiffs contend that they used the term "Shower to Shower" broadly in their Complaints, and that the term includes all subcategories of Shower to Shower, including Shimmer Effects, Sport, Spice, Morning Fresh, Original Fresh, Breeze Fresh, and Prickly Heat Power. (*Id.* at 30–31.) Further, Plaintiffs argue that their claims are not based on the manufacture of the products alone, but also on PTI Union's role, as the successor of Pharma Tech, in the manufacturing, development, testing, and regulation of the products. (*Id.* at 33.)

In response, the Johnson & Johnson Defendants stress that, despite Plaintiffs' claims that their use of the term "Shower to Shower" in their Complaints encompasses Shimmer Effects, none of the Plaintiffs allege that they, in fact, purchased or used that product. (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 12, *Johnson*, No. 18-1423.) They suggest it is unlikely that any Plaintiff used Shimmer Effects, because it was "a business failure," marketed between 2005 and 2010, and because it was designed to give the user a sparkling or shimmering effect when applied to the skin and was "thus likely to be applied to visible portions of the body rather than used perineally." (*Id.* at 14.)

I start with Plaintiffs' argument that their strict liability claims against Defendants encompass Shimmer Effects. While Plaintiffs contend that their claims include that product, (Moving Br. 31, *Johnson*, No. 18-1423), none of them specifically alleges that they actually used Shimmer Effects, which the Johnson & Johnson Defendants have argued—and Plaintiffs have not disputed—was a fundamentally different product that had a limited market exposure from the other Shower to Shower varietals at issue in this case. Plaintiffs' position that their general

35

allegations with respect to the products used were intended to include Shimmer Effects is untenable. Indeed, Plaintiffs' use of the term "Shower to Shower" in the Complaints is not a substitute for an affirmative allegation that the individual plaintiffs used Shimmer Effects. Rather, the allegations hurled against PTI Union are an after-thought, particularly since PTI Union manufactured a Johnson & Johnson product that has never been alleged to be defective in any of the complaints. This is the very kind of pleading that cannot survive fraudulent joinder scrutiny.

Nor is Plaintiffs' argument that PTI Union was a part of Pharma Tech—a defunct entity—persuasive. Plaintiffs include, in their Motion to Remand, a detailed history of Johnson & Johnson's relationship with Pharma Tech and assert in a broad-brush fashion that PTI Union and Pharma Tech are one and the same. As alleged by Plaintiffs in their *briefing*, Johnson & Johnson entered into a series of agreements in the late 1990s with Pharma Tech to manufacture and package the products at issue. Sometime in 2005, PTI Royston was purportedly formed to run Pharma Tech's manufacturing plant in Georgia, which plant, apparently, PTI Royston still currently maintains. In that connection, Pharma Tech, when it was in existence, allegedly assigned certain manufacturing contracts from Johnson & Johnson to PTI Royston. In essence, according to Plaintiffs, PTI Royston was an affiliate of Pharma Tech. Further, Plaintiffs assert, without any factual support, that PTI Union somehow became Pharma Tech's successor, and that PTI Union continues to do Pharma Tech's bidding.

Plaintiffs' unsupported theory aside, I cannot consider these additional, extrinsic allegations as part of my fraudulent joinder analysis. The Third Circuit has

made clear that while a district court can consider evidence outside the pleadings in assessing whether a party was fraudulently joined in certain limited circumstances, the district court must not "step[] 'from the threshold jurisdictional issue into a decision on the merits.'" *In re Briscoe*, 448 F.3d at 219 (quoting *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 112 (3d Cir. 1990)). In other words, for the purposes of fraudulent joinder, here, I must look to the four corners of the Complaint and determine whether Plaintiffs have sufficiently alleged facts that would, at least, raise a colorable claim against PTI Union. I, first, point out that Plaintiffs make no mention in their Complaint that PTI Union and Pharma Tech are one and the same, let alone make any allegations as to *how* these two separate entities, one of which is no longer in existence, are interrelated. Simply, Plaintiffs cannot use their Motion to Remand as a means to amend their Complaint to add these new allegations. *See Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (quotation omitted); *Com. of Pa. ex rel. Zimmerman v PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quotation omitted). Accordingly, the Court will not consider these newly presented averments to show a connection between PTI Union and Pharma Tech.[17]

---

[17]    Even if I were to consider these allegations, my analysis would not change. While Plaintiffs have presented some documents relating to Pharma Tech's relationship with Johnson & Johnson, they still fail to show that PTI Union was somehow the same entity as Pharma Tech or succeeded Pharma Tech. *See, infra.*

Looking only to the Complaint, Plaintiffs allege, in a conclusory manner, that PTI Union manufactures Johnson & Johnson products at issue in this case, but at the same time concedes that PTI Union only makes Shimmer Effects. Importantly, Pharma Tech is not a defendant is these matters, nor are there any allegations made against Pharma Tech in the Complaint. Without any other allegations, the Court finds Plaintiffs are merely attempting to connect PTI Union to Pharma Tech in order to effect diversity jurisdiction, and in that regard, that they have no real intention to prosecute the action against PTI Union. Accordingly, I find PTI Union is fraudulently joined.

### d.    Schnuck Markets Is Fraudulently Joined

Lastly, I turn to whether Schnuck Markets, the only nondiverse Defendant in *Barsh*, is fraudulently joined. While the parties devote a substantial portion of their briefing to whether Missouri's innocent seller statute acts as a bar to the *Barsh* Plaintiffs' claims against Schnuck Markets, the Court need not address these arguments because it is clear from the face of their Complaint that Schnuck Markets is fraudulently joined. The sum of the allegations in the *Barsh* Complaint against Schnuck Markets is that the talcum powder products manufactured by the other Defendants in this matter were "distributed and sold to retailers and other outlets (such as [Schnuck Markets]." (Compl. ¶¶ 8–11, *Barsh*, No. 18-17103.) Moreover, the only counts that can be construed as being asserted against Schnuck Markets are the counts against "all Defendants," which are the *Barsh* Plaintiffs' claims for breach of implied warranties, civil conspiracy, and concert of action. (*Id.* ¶¶ 165–79.) The Johnson & Johnson Defendants contend that this "dearth" of allegations against

38

Schnuck Markets is a tell-tale sign it was fraudulently joined. (Johnson & Johnson Opp'n to Mot. to Remand 14, *Barsh*, No. 18-17103.) Plaintiffs, however, assert that they made more substantial allegations against Schnuck Markets as it was included in allegations made against all "Defendants." (Reply Br. 12, *Barsh*, No. 18-17103.)

The Court finds that the complete lack of allegations, let alone specific ones, against Schnuck Markets demonstrates that it was fraudulently joined. The *Barsh* Plaintiffs' 222-paragraph Complaint makes minimal reference to this Defendant and, glaringly, fails to even allege that any of the Plaintiffs purchased Defendants' products from that retailer. As one court has aptly put it, there is "no better admission of fraudulent joinder" than the failure of a plaintiff "to set forth any specific factual allegations" against a defendant. *Lyons v. Amer. Tobacco Co., Inc.*, No. 96-881, 1997 WL 809677, at *5 (S.D. Ala. Sept. 30, 1997). For example, in *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002), the Eastern District of Pennsylvania found that certain pharmacies were fraudulently joined in a products liability action where the complaint made no specific allegations against the pharmacies. Indeed, the allegations against the pharmacies in *Diet Drugs* was limited to "general statements levied against all defendants, which most properly can be read as stating claims against the drug manufacturers." *Id.* (citing *In re Rezulin Prods. Liab.*, 133 F. Supp. 2d 272, 291 (S.D.N.Y. 2001)). The same holds true here. Plaintiffs purportedly bring claims of breach of implied warranties, civil conspiracy, and concert of action against Schnuck Markets. But, to succeed on those claims, Plaintiffs need to draw some connection between the Plaintiffs' purchase of Defendants' talcum powder products

39

and Schnuck Markets. No such connection has been alleged in the Complaint. *See Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 218–19 (4th Cir. 2015) (finding non-diverse defendants were fraudulently joined where there were no specific factual allegations against the defendants); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 260–61 (5th Cir. 1995) (affirming district court's finding of fraudulent joinder where the complaint was devoid of sufficient factual material to support claims). There is simply "no reasonable basis in fact or colorable ground supporting the claim" against Schnuck Markets, nor does there appear to be any "real intention in good faith to prosecute the action against the defendant[] or seek a joint judgment." *In re Briscoe*, 448 F.3d at 216. For that reason, the Court finds that Schnuck Markets is fraudulently joined.

Because Schnuck Markets and PTI Union were fraudulently joined, they remain defendants in this MDL, and as such, their citizenships are not considered for the purpose of determining diversity jurisdiction.[18] *See In re Diet Drugs*, 220 F. Supp. 2d at 419 ("The presence of a party fraudulently joined cannot defeat removal.") (citing *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921). The *Barsh* Plaintiffs filed their Complaint on July 30, 2018, after both of the PTI Defendants ceased to be citizens of Missouri. Thus, the requirements of diversity are satisfied, and the *Barsh* Plaintiffs' motion to remand is denied and each Plaintiff in the *Barsh*

---

[18]    While the Court is aware that PTI Union has filed motions to dismiss in these matters, because I am severing certain plaintiffs and allowing each of them to file a separate complaint, PTI Union may renew its motion to dismiss in those cases in which it remains a defendant.

Complaint is therefore directed to file a separate Complaint, except for the first named Plaintiff, who will retain the original *Barsh* civil action number and caption.[19]

### 3. Class Three: Plaintiffs Who Do Not Share Citizenship with Any Defendant[20]

Class Three consists of all Missouri Plaintiffs who filed their action after June 6, 2018; all Florida Plaintiffs who filed their action before June 6, 2018; and all Plaintiffs who are not citizens of California, Florida, Georgia, New Jersey, or Missouri. *Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, *Hittler*, *Benford*, *McConnell*, and *Kannady* involve Plaintiffs that fall into this class. More particularly, *Hittler*, *Benford*, *McConnell*, *Kannady* and *Barsh* involve Missouri Plaintiffs who filed their claims after June 6, 2018; *Johnson* includes three Plaintiffs who are citizens of Florida and their complaint was filed before June 6, 2018, (Compl. ¶¶ 49, 75–76, *Johnson*, No. 18-1423); and most of the cases have named plaintiffs who are not citizens of California, Florida, Georgia, New Jersey, or Missouri. As such, Class Three Plaintiffs do not share citizenship with any defendant. While the Court has diversity jurisdiction over Class Three Plaintiffs' claims, I must further determine whether personal jurisdiction exists over each defendant.

Both the Johnson & Johnson Defendants and PTI Royston dispute whether Missouri courts have personal jurisdiction over them. (*See, e.g.*, Johnson & Johnson

---

[19]   Each of the *Barsh* Plaintiffs' complaints shall name the Johnson & Johnson Defendants, PTI Union, Imerys and Schnuck Markets as defendants. PTI Royston, as discussed more fully below, is dismissed for lack of personal jurisdiction.

[20]   After the Court's fraudulent joinder analyses, the *Barsh* Plaintiffs are included as Class Three Plaintiffs.

Defs.' Opp'n to Mot. to Remand 3–9, 22–38, ECF No. 72, *Kannady*, No. 19-13476 (D.N.J. Aug. 5, 2019).) More specifically, the Johnson & Johnson Defendants contend that they are not subject to general jurisdiction in Missouri and, further, that the Court should only exercise specific personal jurisdiction over those plaintiffs who have alleged a sufficient connection to Missouri. (*Id.* at 22–38.) In PTI Royston's Renewed Motions to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, it also argues that Missouri courts lack specific or general jurisdiction over it. (*See, e.g.*, PTI Royston's Mot. to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim Moving Br. 39, ECF No. 51-1, *Kannady*, No. 19-13476 (D.N.J. July 2, 2019).)

Plaintiffs' theories of personal jurisdiction are, at best, convoluted. From what can be discerned from Plaintiffs' briefing, both in support of their Motion to Remand and in opposition to PTI Royston's Motion to Dismiss, Plaintiffs appear to assert that there is specific jurisdiction over the Johnson & Johnson Defendants and PTI Royston under a stream of commerce theory. Further, Plaintiffs contend that there is both general and specific jurisdiction over PTI Royston based on its purported connection to PTI Union and Pharma Tech. These arguments, as discussed more thoroughly *infra*, conflate the principles of general and specific personal jurisdiction. The Court now turns to these arguments.

### a. *General Personal Jurisdiction*

The parties first dispute whether there is general jurisdiction over PTI Royston in Missouri.[21] Plaintiffs present two theories of general personal jurisdiction: (1) PTI Union's Missouri principal place of business may be imputed to PTI Royston under an alter-ego theory; and (2) PTI Royston is "essentially at home" in Missouri.

"A district court sitting in diversity may assert personal jurisdiction over a nonresident defendant to the extent allowed under the law of the forum state." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). In cases transferred under the MDL statute, 28 U.S.C. § 1407, however, "the substantive law of the transferor forum . . . controls the analysis of pre-trial issues involving state law, including the defense that the court lacks personal jurisdiction over the defendants." *In re Nazi Era Cases Against German Defendants Litig.*, 320 F. Supp. 2d 204, 214 (D.N.J. 2004), *aff'd*, 153 F. App'x 819 (3d Cir. 2005). "The law of the transferee forum applies . . . to federal questions. . . ." *Id.* In that regard, "Missouri's long-arm statute was designed to allow the exercise of jurisdiction over out-of-state defendants to the extent permissible under the due process clause." *State ex rel. Nixon v. Beer Nuts, Ltd.*, 29 S.W.3d 828, 833 (Mo. Ct. App. 2000). "General jurisdiction is based upon the defendant's continuous and systematic contacts with the forum and exists even if the plaintiff's cause of action arises from defendant's non-forum related activities." *Benitez v. JMC Recycling Sys., Ltd.*, 97 F. Supp. 3d 576, 581 (D.N.J. 2015) (quoting *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (further quotations

---

[21]     There does not appear to be any dispute that Missouri courts do not have general jurisdiction over the Johnson & Johnson Defendants and Imerys. (*See* Johnson & Johnson Opp'n to Pls.' Motion to Remand, at 3–4, *Kannady*, No. 19-13476.)

omitted)). For a court to assert general jurisdiction, the defendant's contacts must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Whereas a limited liability company's citizenship for the purposes of determining diversity jurisdiction is ascertained by tracing the citizenship of its members, *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013) (quoting *Zambelli*, 592 F.3d at 418), for the purposes of general personal jurisdiction, a limited liability company's citizenship is that of its principal place of business and state of incorporation. *See Griggs v. Swift Transp. Co.*, No. 17-13480, 2018 WL 3966304, at *2 & n.26 (D.N.J. Aug. 17, 2018) ("Courts have applied the *Daimler* rules to limited liability companies with 'equal force.'"); *Duncanson v. Wine & Canvas IP Holdings LLC*, No. 16-00788, 2017 WL 6994541, at *2–4 (S.D. Ind. Apr. 20, 2017) (explaining that the difference derives from diversity jurisdiction being a statutory construction, while personal jurisdiction is a matter of due process under the Fourteenth Amendment); *Daimler AG*, 571 U.S. at 138–39 (applying the "paradigm" for general jurisdiction over corporations to a limited liability company); *Frutta Bowls Franchising LLC v. Bitner*, No. 18-2446, 2018 WL 6499760, at *3 (D.N.J. Dec. 10, 2018) (applying *Daimler*'s paradigm to a limited liability company); *Carruth v. Michot*, No. 15-189, 2015 WL 6506550, at *7 (W.D. Tex. Oct. 26, 2015) (stating that disregarding a limited liability company's corporate form and looking directly to the citizenship of its members contravenes the United States Supreme Court's directive

in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 486 (1985), against "talismanic jurisdictional formulas" and its focus on purposeful availment).

"'Principal place of business' . . . refer[s] to the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Although the United States Supreme Court's definition of "principal place of business" derives from statutory considerations, *id.* at 84–97, it applies in the context of personal jurisdiction. *See Daimler AG*, 571 U.S. at 137–39 (citing *Hertz Corp.*, 559 U.S. at 94); *see also id.* at 157 (Sotomayor, J., concurring) ("The majority does not dispute that a State can exercise general jurisdiction where a corporate defendant has its corporate headquarters, and hence its principal place of business within the State.") (citing *Hertz Corp.*, 559 U.S. at 93). "[I]n practice [the 'principal place of business'] should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center,' and not simply an office where the corporation holds its board meetings." *Hertz Corp.*, 559 U.S. at 93. At times, determining a corporation's principal place of business can defy common sense; "[f]or example, if the bulk of a company's business activities visible to the public take place in New Jersey, while its top officers direct those activities just across the river in New York, the 'principal place of business' is New York." *Id.* at 96.

"[P]laintiff[s] bear[] the burden of demonstrating the facts that establish personal jurisdiction . . . ." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). "If the district court does not hold an evidentiary hearing, 'the plaintiff[s] need only establish a prima facie case of personal jurisdiction.'" *Metcalfe*, 566 F.3d at 330

(quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (alterations in original) (internal quotation marks omitted)).

### *i.   Principal Place of Business*

As PTI Royston is a LLC, the Court looks to both its place of incorporation and its principal place of business for the purpose of determining if general jurisdiction exists. There is no dispute that PTI Royston is incorporated under the laws of Delaware. (*See* Pls.' Opp'n to PTI Royston Mot. to Dismiss 6–7, *Kannady*, No. 19-13476.) Nor is there any real dispute that PTI Royston's stated principal place of business is in Georgia. Instead, Plaintiffs maintain that while PTI Royston purportedly has its principal place of business in Georgia, its "actual principal place of business" is in Missouri "by merger, dominion and control, agency, and/or its alter ego status." (*See, e.g.*, Compl. ¶¶ 119, 123–24, *Kannady*, No. 19-13476.) To that end, Plaintiffs seek to impute PTI Union's and Pharma Tech's Missouri principal places of business to PTI Royston based on the connection between the three corporations.[22] (*See* Pls.' Resp. in Opp'n to PTI Royston Renewed Mot. to Dismiss 7, *Kannady*, No. 19-13476.) In making this connection, Plaintiffs contend that the Court may exercise general jurisdiction over PTI Royston as it is an alter ego of PTI Union, the alleged successor of Pharma Tech.[23]

---

[22]   Again, Plaintiffs rely on their theory, discussed *supra*, that PTI Union is the successor of Pharma Tech in support of personal jurisdiction arguments.

[23]   The Johnson & Johnson Defendants, in their Opposition to Plaintiffs' Motion to Remand, argues that the Court should not consider Plaintiffs' alter ego theory of personal jurisdiction because it was not specifically raised in the Complaint. (*See* Johnson & Johnson Opp'n to Pls.' Renewed Mot. for Remand 25, *Kannady*, No. 19-13476.) According to the Johnson & Johnson Defendants, the only allegation in the

"Ordinarily, courts protect the separate legal identities of individual corporations, even if one corporation owns a part or all of the other." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 375 (Mo. Ct. App. 2014). "Alter-ego liability looks at the totality of the parent company's relationship with the subsidiary asking whether the relationship is so 'completely dominated' by the parent company that it is proper to fully 'disregard the corporate form of the subsidiary' altogether." *Goellner-Grant v. Platinum Equity LLC*, 341 F. Supp. 3d 1022, 1028 (E.D. Mo. 2018) (quoting *Blanks*, 450 S.W.3d at 377–80); *see also Laverty v. Cox Enters., Inc.*, No. 18-1323, 2019 WL 351905, at *4 (D.N.J. Jan. 29, 2019) (quoting *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J. 1983)). "[I]t does not matter that a parent company shares in the business success and achievements of its subsidiaries." *Goellner-Grant*, 341 F. Supp. 3d at 1029. Rather, there must be "'*total control* and . . . *improper use* of the subsidiary,'" "which cause 'all activities—and all liabilities—of the subsidiary [to]

---

Complaint that would seem to suggest that Plaintiffs sought to establish personal jurisdiction under an alter ego theory is the allegation that "Defendant PTI Royston, LLC was acting at the direction of or on behalf of the Johnson & Johnson Defendants, Defendant Imerys Talc, and/or PTI Union, LLC carrying out a common plan, scheme, or conspiracy, acting within the . . . scope of its employment or agency." *Id.* at 25 n.4. The Johnson & Johnson Defendants, however, argue that this assertion, which is directed at all defendants, is insufficient to allege that PTI Royston is the alter ego of PTI Union or Pharma Tech. *Id.* Plaintiffs do not respond to this argument. Nevertheless, the Court has reviewed Plaintiffs' Complaint, and it is clear that Plaintiffs have raised their alter ego theory of personal jurisdiction, albeit in a conclusory manner. Indeed, in setting forth the parties to this action, Plaintiffs allege that "Defendant PTI Royston, LLC, was and is a citizen of the State of Missouri, with its purported principal place of business in Royston, Georgia. As further detailed herein, Defendant PTI Royston, LLC's actual principal place of business at relevant times was and is Union, Missouri, by merger, dominion and control, agency, and/or its alter ego status." (Notice of Removal, Ex. A. ¶ 124, *Kannady*, No. 19-13476.) In any event, as discussed *infra*, Plaintiffs have not sufficiently alleged such a theory.

become those of the parent.'" *Id.* (quoting *Blanks*, 450 S.W.3d at 377–80) (emphasis and second alteration in original). The subsidiary must "simply [be] a shell designed to artificially distance the parent company from what are, in reality, its own acts." *Id.*

Piercing the corporate veil "is an equitable doctrine used by the courts to look past the corporate form and impose liability upon owners of the corporation—be they individuals or other corporations—when the owners create or use the corporate form to accomplish a fraud, injustice, or some unlawful purpose." *Blanks*, 450 S.W.3d at 375. To pierce the corporate veil, a plaintiff must show:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff s legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Collet v. Am. Nat. Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. Ct. App. 1986) (quoting *Nat'l Bond Finance Co. v. General Motors Corp.*, 238 F. Supp. 248, 255 (W.D. Mo. 1964)). Indeed, "[a]ppropriate subsidiary involvement for a parent can include monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *In re Genetically Modified Rice Litig.*, 576 F. Supp. 2d 1063, 1072 (E.D. Mo. 2008) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).

Here, in support of their alter-ego theory of general jurisdiction, Plaintiffs argue PTI Royston was a shell corporation of Pharma Tech, to which PTI Union is a successor, and that both companies (PTI Royston and Pharma Tech) were wholly controlled and operated by Edward Noland, Sr. (Pls.' Opp'n to PTI Royston's Mot. to Dismiss, at 48–49, *Kannady*, No. 19-13476.) They suggest both companies shared a Missouri headquarters and assert that the PTI Defendants and Pharma Tech always held themselves out to be the same company. (*Id.*) Plaintiffs point to, among other things, coordination between the Royston and Union manufacturing plants, (*id.* at 18); that the PTI Defendants shared a FEIN number, which was used to purchase talc, (*id.*); a supply chain responsibility agreement that listed "Pharma Tech Industries, Inc., Royston, GA['s]" headquarters as Union, Missouri, (*id.* at 19 (quoting Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 26, Sealed Supply Chain Responsibility Agreement 1, ECF No. 63-20, *Kannady*, No. 19-13476 (July 22, 2019))); that PTI Royston's corporate records were maintained in Missouri, (*id.* at 21 (citing Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 31, Appl. For Certification of Authority for Foreign Limited Liability Company, ECF No. 62-7, *Kannady*, No. 19-13476 (July 22, 2019))); that the PTI Defendants identify themselves as one entity with two facilities on their website, (*id.* at 23); and that Edward Noland, Sr. was identified as the chairman of PTI Royston in its Spring 2012 eBulletin (*id.* at 29 (citing Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 46, Pharma Tech Industries Spring 2012 eBulletin 1, ECF No. 62-14, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019))). Plaintiffs note that, while Edward Noland, Jr.'s affidavit asserts that his father, Edward Noland, Sr., and Pharma Tech never had management authority

49

over PTI Royston, he does not identify who had management authority or control over the plant. (*Id.* at 27–29.) Plaintiffs further contend that Edward Noland, Jr.'s assertion that PTI Union controls its day-to-day operations from Georgia is belied by a mountain of evidence that it was part of the Missouri operation. (*Id.* at 32.)

PTI Royston responds that Plaintiffs' evidence shows that Edward Noland, Sr., was the "chairman" of "PTI" or "Pharma Tech Industries," but not PTI Royston. (PTI Royston's Reply in Support of its Renewed Mot. to Dismiss 3, ECF No. 74, *Kannady*, No. 19-13476 (D.N.J. Aug. 9, 2019).) In fact, PTI Royston submits, Edward Noland, Sr., was never an officer of PTI Royston or drew a salary from it. (*Id.* at 3 (citing PTI Royston's Moving Br. Ex. D, Noland, Sr. Aff., at ¶¶ 5–9, ECF No. 51-6, *Kannady*, No. 19-13476 (D.N.J. July 2, 2019).) PTI Royston admits that while the various PTI entities did not distinguish themselves in every document, such conduct does not rise to the level of alter ego. (*Id.* at 4.) In that regard, PTI Royston contends that there is no evidence that it operated—or even claimed to operate—out of Missouri, and that the Supply Chain Responsibility Agreement was executed by Pharma Tech. (*Id.*) PTI Royston emphasizes that the letter stating the PTI Defendants "merged (on paper only)" was sent by Edward Noland, Sr., who never served as an officer of either PTI Defendant and would not have known if they ever took steps toward a legal merger. (*Id.* at 5.) Instead, PTI Royston argues it and PTI Union always operated as Delaware LLCs with their principal places of business located where each operated its facilities. (*Id.*)

Having reviewed the record, I find that Plaintiffs' allegations are not sufficient for the Court to disregard PTI Royston's separate corporate form. Plaintiffs' alter ego

theory is predicated on the alleged coordination between the two companies and allegations that they held themselves out as parts of the same enterprise. Those allegations, however, fall short of the showing necessary to disregard PTI Royston's separate identity. Beyond a conclusory assertion that PTI Royston is a "mere shell," the record shows that PTI Royston and PTI Union are separate manufacturing plants, owned by the same family, and coordinated their business activities for mutual benefit. But, mere coordination is not a basis to disregard PTI Royston's corporate form. Indeed, Plaintiffs do not allege PTI Union controlled the day-to-day operations of PTI Royston, and they have failed to demonstrate total dominance by the alleged parent. Most importantly, Plaintiffs do not allege PTI Royston's purported use of a separate corporate identity was in any way an abuse of the privilege.

Moreover, to the extent that Plaintiffs assert that PTI Royston "disavowed" Georgia as its principal place of business, their arguments similarly fail. On this point, it appears Plaintiffs argue that PTI Royston, in certain instances, held itself out as having a principal place of business in Missouri. I disagree. Plaintiffs have not proffered any evidence in support of their assertion that PTI Royston's principal place of business was in fact in Missouri. Rather, that assertion is belied by the record. For example, PTI Royston's 2005 Application for Certificate of Authority for Foreign Limited Liability Company lists PTI Royston's principal place of business in Georgia, lists its manager as Edward Noland, Jr., and lists his Georgia address. (Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 31, Appl. for Certification of Authority for Foreign Limited Liability Company, *Kannady*, No. 19-13476.) In another example, Plaintiffs point to "Pharma Tech Industries['s]" former Vice President of Engineering

51

and former Vice President of Supply Chain's LinkedIn page, which states that he was responsible for engineers, engineering technicians, and project managers supporting two manufacturing sites. (Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 40, Bryan Cox Linkedin Page 1–2, *Kannady*, No. 19-13476.) However, that former employee listed both jobs as being located in Georgia. (*Id.*) More importantly, in his affidavit, Edward Noland, Jr., attests that PTI Royston's principal place of business is Georgia, that Edward Noland, Sr., never had day-to-day operational management authority over PTI Royston, and that PTI Royston continues to direct its day-to-day operations from Georgia. (PTI Royston's Renewed Mot. to Dismiss, Tinsley Certification Ex. B, at ¶¶ 4, 10, 19, ECF No. 51-4, *Kannady*, No. 19-13476 (D.N.J. July 2, 2019).) In short, while Plaintiffs have submitted evidence that tends to show that the PTI Defendants coordinated with each other and share certain officers, none of these facts establish the type of "total control" or "abuse of corporate form" that must exist for veil piercing to be appropriate. Accordingly, Plaintiff has failed to demonstrate that PTI Royston maintains a principal place of business in Missouri.

### ii.  *Essentially at Home*

Alternatively, Plaintiffs contend that general jurisdiction exists because PTI Royston is "essentially at home" in Missouri. (*See* Pls.' Opp'n to PTI Royston Mot. to Dismiss, 52, *Kannady*, No. 19-13476.) In *Daimler*, the Supreme Court noted that "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in the state." *Daimler*, 571 U.S. at 139 n.19. Plaintiffs argue that this is such an exceptional circumstance "given the myriad of operations and

affiliations PTI Royston has with the Missouri forum," and because "PTI Royston itself is a Missouri citizen and one of its four members literally has her home in Missouri." (*See* Pls.' Opp'n to PTI Royston Mot. to Dismiss, 52, *Kannady*, No. 19-13476.) This conclusory argument holds no weight. Indeed, as the Court has set forth, Plaintiffs' allegations with respect to any connection between PTI Royston and PTI Union demonstrates, at most, coordination between the two companies. Plaintiffs offer no support for their argument that such coordination represents the type of "exceptional" circumstance that would warrant a finding that PTI Royston is essentially at home in Missouri.

Moreover, Plaintiffs' assertion that one of PTI Royston's members is a citizen of Missouri is unavailing for two reasons. First, Plaintiffs claim that Broadview, PTI Royston's sole member, has four members, one of whom is a Missouri citizen. (Opp'n to PTI Royston's Renewed Mot. to Dismiss 16, 45 & n.146, *Kannady*, No. 19-13476.) To support this assertion, Plaintiffs cite Edward Noland, Jr.'s Affidavit, but the cited paragraph states "PTI Royston, LLC has a sole member, Broadview [] which was formed in 2005 by Carl Oberg, Lee Dickenson, . . . Laura Tarrasch, and me." (*Id.* at 16 & n.46; Tinsley Cert. Ex. B, Noland Aff. ¶ 5, ECF No. 51-4, *Kannady*, No. 19-13476 (July 2, 2019).) It does not represent, however, that they are members of Broadview. Edward Noland, Jr's Declaration, which is attached as an exhibit to the Notice of Removal, identifies Broadview's members as the Revocable Living Trust, the Irrevocable Trust, the Revocable Trust, and Family Trust. (Noland Decl. ¶ 8, *Kannady*, No. 19-13476.) Furthermore, even if one of the members of Broadview is a Missouri resident, that citizenship has no bearing on PTI Royston's citizenship for

53

the purposes of general jurisdiction. *See Griggs*, 2018 WL 3966304, at *2 & n.26 (observing that citizenship of an LLC for general personal jurisdiction is based on place of incorporation and principal place of business); *Duncanson*, 2017 WL 6994541, at *4 (vacating personal jurisdiction determination made based on citizenship of LLC's members "[b]ecause fundamentally different considerations guide the citizenship inquiry (Congress's statutory enactments and the Court's precedents, even if they are incongruous with the realities of business organizations) than guide personal jurisdiction issues (due process))"); *see also Daimler AG*, 571 U.S. at 138–39.

Accordingly, the Court finds that Missouri courts do not have general personal jurisdiction over PTI Royston.

### b. *Specific Jurisdiction*

"In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) (quoting *Goodyear*, 564 U.S. at 919) (internal quotation marks and brackets in original omitted) (alteration in original). This Court engages in a three-part inquiry when assessing specific jurisdiction. *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009); *Christie v. Nat'l Inst. for Newman Studies*, 258 F. Supp. 3d 494, 500 (D.N.J. 2017). The Court examines whether: (1) the defendants' activities were "purposefully directed at the forum," (2) whether the plaintiffs' claims "arise out of or relate to at least one of those specific activities," and (3) whether exercising jurisdiction "otherwise comport[s] with fair play and substantial justice." *Christie*,

54

258 F. Supp. 3d at 500 (quoting *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (internal quotations and citations omitted)); *see also Bristol-Myers*, 137 S. Ct. at 1778–79. "The first two parts of the test determine whether a defendant has the requisite minimum contacts with the forum." *D'Jamoos*, 566 F.3d at 102. "The threshold requirement is that the defendant must have 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" *Id.* at 103 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (alteration in original).

In *Bristol-Myers Squibb*, the Unites States Supreme Court held that California courts could not exercise specific jurisdiction over the out-of-state defendant, in situations where nonresident-plaintiffs were allegedly injured by ingesting the defendant's drug in their own states of residence, and not in California. The Court reasoned that those plaintiffs "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California." 137 S. Ct. at 1781. It went on to explain that "[t]he mere fact that *other* plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* emphasis in original). The Court added that it is not "sufficient—or even relevant— that [the company] conducted research in California on matters unrelated to Plavix," and that "[w]hat is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id.*

"The stream-of-commerce theory contends, essentially, that specific personal jurisdiction exists over a non-resident defendant when that defendant 'has injected

its goods into the forum state indirectly via the so-called stream of commerce,'
rendering it foreseeable that one of the defendant's goods could cause injury in the
forum state." *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018)
(quoting *D'Jamoo*s, 566 F.3d at 104–05). "In *J. McIntyre Machinery, Ltd. v. Nicastro*,
the Supreme Court attempted to clarify the scope of the 'stream of commerce' theory."
*Benitez v. JMC Recycling Sys., Ltd.*, 97 F. Supp. 3d 576, 582 (D.N.J. 2015) (citing *J.
McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011)). "Although the plurality
opinion in *Nicastro* 'does not clearly or conclusively define the breadth and scope of
the stream of commerce theory, . . . there is no doubt that *Nicastro* stands for the
proposition that targeting the national market is *not* enough to impute jurisdiction to
all the forum states.'" *Id.* at 583 (quoting *Oticon, Inc. v. Sebotek Hearing Sys., LLC*,
865 F. Supp. 2d 501, 513 (D.N.J. 2011) (emphasis in original)).

### i. *Johnson & Johnson Defendants*

Plaintiffs argue that there is specific personal jurisdiction over the Johnson &
Johnson Defendants in Missouri based on a stream of commerce theory of personal
jurisdiction. (*See* Moving Br. at 35–36, *Kannady*, No. 19-13476.) Specifically,
Plaintiffs assert that "Defendants and their agents committed torts in and from
Missouri against all Plaintiffs including negligent and wrongful conduct in the
research, development, testing, manufacture, production, promotion, distribution,
market and sale of Johnson's Baby Powder and Shower to Shower." (*Id.*) Indeed,
Plaintiffs maintain that the connection of this matter to Missouri is meaningful
because "the subject Products were manufactured, processed, bottled, mislabeled,
and mispackaged . . . [in] Missouri and Georgia." (*Id.* at 40.) In support of this

argument, Plaintiffs rely on a handful of unpublished cases for the proposition that specific jurisdiction is based on whether there is a meaningful connection to the forum state, not on whether there are extensive contacts with the forum. (Moving Br. 38–39, *Kannady*, No. 19-13476 (discussing *M.M. ex rel. Meyers v. GlaxoSmithKline LLC*, 61 N.E.3d 1026, 1040 (Ill. App. Ct. 2016); *Cortina v. Bristol-Myers Squibb Co.*, No. 17-247, 2017 WL 2793808 (N.D. Cal. June 27, 2017); *Dubose v. Bristol-Myers Squibb Co.*, No. 17-244, 2017 WL 2775034 (N.D. Cal. June 27, 2017); and *In re Syngenta Mass Tort Actions*, No. 16-255, 2017 WL 2117728 (S.D. Ill. May 15, 2017)).)

In response, the Johnson & Johnson Defendants argue that the vast majority of Plaintiffs do not allege that they bought or were injured by the products in Missouri.[24] (Johnson & Johnson Defs.' Opp'n to Mot. to Remand 31, *Kannady*, No. 19-13476.) Without any allegation connecting these Plaintiffs to Missouri, the Johnson and Johnson Defendants maintain that the Missouri courts have no grounds on which to exercise specific jurisdiction over them. (*Id.*) Moreover, to the extent Plaintiffs seek to rely on contractual relationship between the Johnson & Johnson Defendants and

---

[24]     The Johnson & Johnson Defendants do not dispute that there is specific personal jurisdiction over them with respect to claims brought by nonresident and Missouri Plaintiffs alike, who have alleged a specific connection to Missouri. This includes twenty-three (23) Class Three Plaintiffs who are Missouri citizens and the following Class Three Plaintiffs who do not reside in Missouri, but allege that they purchased and/or applied the talc products in Missouri: Laura Armes, (*see* Notice of Removal, Ex. A ¶ 8, *Kannady*, No. 19-13476, ECF No. 1-1); Carol Calhoun, (*see id.* ¶ 26); Judith Hovorka (*see* Notice of Removal, Ex. B ¶ 33, *Johnson*, No. 18-1423, ECF No. 1-1); Maureen Kassimali, (*see* Notice of Removal, Ex. B ¶ 2, *Kassimali*, No. 18-5534, ECF No. 1-2); Margaret Chitwood, (*see* Notice of Removal, Ex. B ¶ 18, *Gavin*, No. 18-10319, ECF No. 1-2); Gloria Barotta, (*see* Notice of Removal, Ex. B ¶ 4, *Reising*, No. 18-10320, ECF No. 1-2); Karen Gotzler, (*see id.* ¶ 36); and Heather Sisk, (*see* Notice of Removal, Ex. A ¶ 65, *McConnell*, No. 19-9365, ECF No. 1-1).).

the PTI Defendants, the Johnson & Johnson Defendants respond that PTI Union only manufactured Shimmer Effects in Missouri—a product Plaintiffs have not alleged to have used—while Johnson & Johnson Baby Powder and Shower to Shower were manufactured by PTI Royston in Georgia. (*Id.* at 32.) The Johnson & Johnson's Defendants explain that companies commonly contract with third parties to facilitate the manufacture and sale of products and that such outsourcing does not make those companies subject to personal jurisdiction in the third-party's home jurisdiction.

At the outset, I note that Plaintiffs' specific jurisdiction arguments are confusing and hard to follow. Based on my review, it appears that Plaintiffs' "chain" of minimum contacts begins with PTI Union, (*see* Moving Br. 40, *Kannady*, No. 19-13476), which they do not contest only produced Shimmer Effects. (*Id.* at 14). Based on PTI Union's relationship with its related company, PTI Royston, in Georgia, Plaintiffs seek to impute PTI Union's Missouri contacts to PTI Royston. (*Id.* at 40, 44–47.) From there, Plaintiffs ask the Court to further impute PTI Union's Missouri contacts to the Johnson & Johnson Defendants, alleging that "PTI Royston, LLC was acting at the direction of or on behalf of the Johnson & Johnson Defendants, Defendant Imerys Talc, and/or PTI Union, LLC carrying out a common plan, scheme, or conspiracy, acting within the course & scope of its employment or agency." (Compl. ¶ 100, *Kannady*, No. 19-13476; Moving Br. 29, *Kannady*, No. 19-13476.) In their discussion of the factual background of this case, Plaintiffs also point to several facts relevant to this Court's consideration of specific jurisdiction. (Moving Br. 24–25, *Kannady*, No. 19-13476.) Those facts are: (1) Johnson & Johnson entered into agreements with two group purchasing organizations, one based in St. Louis,

Missouri, and the other headquartered in Earth City, Missouri, to facilitate the sale of its Baby Powder nationwide; (2) Johnson & Johnson entered into a promotion agreement with a Missouri corporation in 2015; (3) Johnson & Johnson tested the sale of its baby products on an endcap at a K-Mart in St. Louis; and (4) Johnson & Johnson interviewed a Missouri woman who used baby powder as part of its market research. (*Id.*) After considering this hodgepodge of facts and conclusions, I find that Plaintiffs have not met their burden.

Essentially, the Class Three Plaintiffs who have no connection to Missouri are missing the requisite contact between their claims and the Johnson & Johnson Defendants under *Bristol Myers Squibb*. The fact that the Johnson & Johnson Defendants contracted with an instate manufacturer to produce some of its products does not confer jurisdiction. *See Jinright v. Johnson & Johnson, Inc.*, No. 4:1701849, 2017 WL 3731317, at *4–5 (E.D. Mo. Aug. 30, 2017). This is so because Johnson & Johnson's agreements with the Missouri companies was to facilitate the indiscriminate nationwide sale of its products, including the products that allegedly injured Plaintiffs. While those contacts might well constitute purposeful availment of the benefits and protections of the State of Missouri in a contract action, these contacts are irrelevant in this products liability action. Indeed, Plaintiffs have not demonstrated that their injuries in any way arise out of those specific agreements. *See id.* at *5. In other words, they neglect to allege a connection between their injuries and those specific distribution agreements. (Moving Br. Ex. 44, Sealed Group Purchasing Agreement, at 1, ECF No. 59-32, *Kannady*, No. 19-13476 (D.N.J. July 5, 2019).) Adding to this deficiency, Plaintiffs fail to allege any connection between

Johnson & Johnson's 2015 promotional agreement with a Missouri corporation and Plaintiffs' alleged injuries.

Finally, Plaintiffs relied upon market research to assert specific jurisdiction, implying that generic market research is a form of a clinical trial. *See In re Syngenta Mass Tort Actions*, 2017 WL 2117728, at *4–5 (analogizing clinical trials to various steps in the commercialization process, including selling, promoting, and testing the product in the forum state). For example, in *Cortina*, the United States District Court for the Northern District of California distinguished *Bristol-Myers Squibb*, finding the plaintiff sufficiently alleged "that but for the pre-NDA development of the [drug] within the [forum state], the drugs would not have been sold and marketed throughout the U.S. nor ingested by [the plaintiff]." *Cortina*, 2017 WL 2793808, at *4. Similarly, in *M.M. ex rel. Meyers*, the Appellate Court of Illinois found "plaintiffs' claims arose out of the [clinical] trials conducted" in the forum state and that the defendant "did not offer uncontradicted evidence that defeats jurisdiction." 61 N.E.3d at 1040–41 (internal quotation marks omitted). In each of those cases, however, the plaintiffs alleged that the clinical trials were integral to bringing the products to market nationwide. There is no such allegation here. Plaintiffs' evidence consists of a series of emails from 2008 discussing market research in Missouri, (Moving Br. Ex. 53, Sealed Emails Regarding Endcap Market Research, at 1–2, ECF No. 59-41, *Kannady*, No. 19-13476 (D.N.J. July 5, 2019); (Moving Br. Ex. 54, Sealed Emails Regarding Qualitative Research, at 1–2, ECF No. 59-42, *Kannady*, No. 19-13476 (D.N.J. July 5, 2019)), but there is no allegation that the Missouri market research was in any way integral to bringing the products at issue to market in the places

60

where the Class Three Plaintiffs purchased them. In fact, it is not even clear from Plaintiffs' evidence whether the Johnson & Johnson Defendants were conducting nationwide or Missouri-specific market research. Consequently, the attenuated contacts that Plaintiffs seek to attribute to the Johnson & Johnson defendants do not support their assertion of specific jurisdiction. When these irrelevant contacts are stripped away, Plaintiffs' claims, here, suffer the identical jurisdictional defect criticized by the United States Supreme Court in *Bristol-Myers Squibb*; these plaintiffs simply "did not purchase [the products in Missouri], did not [use them in Missouri], and were not injured by [the products in Missouri]." *Bristol-Myers Squibb*, 137 S. Ct. at 1781. As such, there is not specific personal jurisdiction in Missouri over the Johnson & Johnson Defendants.

### ii. *PTI Royston*

Plaintiffs present two theories as to how the Missouri courts may exercise specific jurisdiction over PTI Royston. First, Plaintiffs assert that there is specific personal jurisdiction over PTI Royston under a stream of commerce theory. Second, Plaintiffs allege that their claims arose from and relate to PTI Royston's activities in Missouri. (Pls.' Opp'n to PTI Royston's Mot. to Dismiss 39, *Kannady*, No. 19-13476.)

The Court first addresses Plaintiffs' stream of commerce theory. Plaintiffs ask the Court to adopt a "broad" stream of commerce theory—that is, so long as PTI Royston was "aware that the final product [was] being marketed in the forum," due process would allow the exercise of specific personal jurisdiction in that state. (*Id.* at 41–42 (quoting *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 117 (1987) (Brennan, J., concurring)).) Moreover, Plaintiffs argue that,

regardless of what stream of commerce theory this Court applies, due process is satisfied because PTI Royston "had actual knowledge they manufactured the entire supply of the products for North America," which "constitutes intent to serve the Missouri forum." (*Id.* at 42.) PTI Royston, however, contends that the mere foreseeability that a product 'will find its way into the forum State' does not establish personal jurisdiction." (PTI Royston Moving Br. 14–15, *Kannady*, No. 19-13476 (quoting *D'Jamoos*, 566 F.3d at 105).) According to PTI Royston, its activities were limited to blending, packaging, and releasing the products in Georgia, and that it neither processed, packaged sold, nor marketed the products in Missouri. (*Id.* at 8–9.) Moreover, PTI Royston maintains that under *Bristol-Myers Squibb*, Plaintiffs cannot rely on a stream of commerce theory because they, themselves, have no connections to Missouri. As such, PTI Royston submits that this Court lacks specific jurisdiction over it. (*Id.* at 9.)

The Court roundly rejects Plaintiffs' stream of commerce argument. Plainly, "efforts to exploit [the] national market necessarily includ[ing] [the forum state] as a target, . . . simply do[] not constitute the type of deliberate contacts within [the forum state] that could amount to a purposeful availment of the privilege of conducting activities in that state." *D'Jamoos*, 566 F.3d at 104. Unlike the Johnson & Johnson Defendants, as alleged, PTI Royston was a manufacturer of talc products in Georgia that took no role in the marketing or selling of those products. Indeed, based on the allegations, PTI Royston's manufacturing activities did not target any sales in the United States as a whole, but rather, PTI Royston was only aware that the products it manufactured would eventually be sold in the United States by Johnson & Johnson.

This expansive stream of commerce theory has been expressly rejected by the Third Circuit and the United States Supreme Court. *See Nicastro*, 564 U.S. at 886 (finding that there was no personal jurisdiction over foreign manufacturer in New Jersey where manufacturer did not purposefully target New Jersey for sale of products and only showed "an intent to serve the U.S. market"); *D'Jamoos*, 566 F.3d at 104 ("[Defendants'] efforts to exploit a national market necessarily included Pennsylvania as a target, but those efforts simply do not constitute the type of deliberate contacts within Pennsylvania that could amount to purposeful availment of the privilege of conducting activities in that state.").

Nor have Plaintiffs demonstrated that specific jurisdiction exists based on PTI Royston's contacts with Missouri. In support of this theory, Plaintiffs point to the same facts as their alter-ego related arguments. Plaintiffs assert that PTI Royston is a Missouri citizen and that its chairman and chief operating officer, Edward Noland, Sr., is also a Missouri citizen who was responsible for initiating the relationship with Johnson & Johnson and controlled operations from Missouri.[25] (*Id.* at 45.) Plaintiffs claim "PTI Royston was specifically formed to act as agent, affiliate, and assignee of the Missouri corporation with principal place of business in Union, Missouri, Pharma Tech." (*Id.* at 46.) They further point to Pharma Tech purchasing the Georgia manufacturing plant before PTI Royston was formed, making payments on the plant after it was formed, and that Pharma Tech was a guarantor of PTI Royston's

---

[25]     The Court notes, however, that there is no evidence that Edward Noland, Sr., controlled PTI Royston and, in fact, Edward Noland, Jr., affirms he did not. (Noland Aff. ¶ 10, *Kannady*, No. 19-13476.)

obligations to JCII. (*Id.* at 46 & nn.150–53 (citing Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 11, Sealed Asset Purchase Agreement 8–9, ECF No. 63-8, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019); Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 15, Sealed Guaranty Agreement 1, ECF No. 63-11, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019)).) Plaintiffs, again, stress that PTI Royston, PTI Union, and Pharma Tech all operated as one company based in Union, Missouri. (*Id.* at 46–47, 48–52.) Plaintiffs submit PTI Royston's contacts with the Missouri forum and its citizens played a vital role in bringing the products to market and, thus, PTI Royston is subject to specific personal jurisdiction in Missouri. (*Id.* at 48.)

To counter, PTI Royston argues that Plaintiffs failed to offer any evidence that it ran its operations from Missouri. (PTI Royston's Reply in Support of its Renewed Mot. to Dismiss 4, *Kannady*, No. 19-13476.) PTI Royston highlights that the evidence cited by Plaintiffs only show Edward Noland, Sr., was chairman and chief operating officer of Pharma Tech—not PTI Royston. (*Id.* at 3.) PTI Royston further contends that Plaintiffs rely on an alleged merger of PTI Royston and PTI Union, which never occurred, and the letter they cite by Edward Noland, Sr., was merely a reassurance to Pharma Tech's contractors that production would continue despite the phasing out of Pharma Tech. (*Id.* at 5.)

Most of Plaintiffs' contentions with respect to specific jurisdiction closely track—and are better suited for—their general jurisdiction argument, which this Court rejected above. Under *Bristol-Myers Squibb*, what is needed for specific jurisdiction is a connection between the forum and the specific claims. 137 S. Ct. at 1781. The general contacts listed above are not specific to Plaintiffs' claims related to

the products. In essence, Plaintiffs have repurposed their general jurisdiction arguments in an attempt to obtain specific jurisdiction. These arguments are unavailing, because there is simply no allegation that PTI Royston targeted Missouri with respect to the manufacture and release of the products at issue. PTI Royston's business connections in Missouri are not sufficient for Missouri courts to exercise specific jurisdiction over PTI Royston, as Plaintiffs' claims do not arise out of those connections.

Plaintiffs further discuss alleged "synergies" between PTI Union and PTI Royston as justification for subjecting PTI Royston to specific personal jurisdiction. In particular, Plaintiffs highlight that Pharma Tech instructed Imerys to use PTI Union's FEIN number for talc purchased for both PTI Union and PTI Royston, PTI Union tested the talc used in the products, and PTI Union participated in the development of cornstarch-based Johnson's Baby Powder Cooling Cucumber Melon.[26] Again, while Plaintiffs attempts to show some coordination between PTI Union and PTI Royston, they allege no activity by PTI Royston in Missouri that could justify the exercise of specific jurisdiction. Instead, they seek to attribute PTI Union's in-forum activities to PTI Royston. As previously discussed, the activities of PTI Royston's

---

[26]     Opp'n to PTI Royston's Renewed Mot. to Dismiss 46–48, *Kannady*, No. 19-13476 (citing Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 19, Sealed Process Development Summary, ECF No. 63-13, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019); Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 22, Sealed Analysis Request, ECF No. 63-16, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019); Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 24, Sealed Sept. 19, 2005, Industrial Sales Activity Report 7, ECF No. 63-18, *Kannady*, No. 19-13476 (D.N.J. July 22, 2019); Pls.' Opp'n to PTI Royston's Renewed Mot. to Dismiss Ex. 37, Sealed Apr. 1, 2008, Letter Pharma Tech to Luzenac, *Kannady*, No. 19-13476).

sister corporation are not attributable to PTI Royston in this case, because Plaintiffs' allegations do not establish that PTI Royston is the mere alter ego of PTI Union. *Cf. In re Chocolate Confectionary Antirust Litig.*, 641 F. Supp. 2d 367, 386 (M.D. Pa. 2009) ("Uniformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency, and imposition of mandatory financial reporting does not divest subsidiaries of control over daily operating activities.").

Accordingly, the Court finds that the Class Three Plaintiffs have failed to establish personal jurisdiction over the Johnson & Johnson Defendants and PTI Royston, and their claims as to these two defendants are dismissed for lack of personal jurisdiction. To be clear, even though the Court has found PTI Union was fraudulently joined, there is no dispute that Missouri courts have general jurisdiction over PTI Union based on its activities there. Hence, the Class Three Plaintiffs' claims as to PTI Union remain at this time.

## III.   **CONCLUSION**

For the reasons expressed above, PTI Union's Motions to Sever are granted. Plaintiffs' Motions to Remand in *Hannah* and *Cartwright* are granted, and Plaintiffs' Motions to Remand in *Barsh*, *Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, *Hittler*, *Benford*, *McConnell*, and *Kannady* are granted, in part, and denied, in part. These cases are hereby remanded, with the exception of all Class Three Plaintiffs in *Barsh Johnson*, *Kassimali*, *Gavin*, *Reising*, *Gibson*, *Hittler*, *Benford*, *McConnell*, and *Kannady*; that is, all Missouri Plaintiffs who filed their action after June 6, 2018; all Florida Plaintiffs who filed their action before June 6, 2018; and all Plaintiffs who are

not citizens of California, Florida, Georgia, New Jersey, or Missouri are not remanded. The Class Three Plaintiffs who are Missouri citizens or allege they purchased the products in Missouri must refile individual complaints and pay the attendant filing fees. Their cases will proceed separately under their own name and civil action number. In these particular complaints, the name defendants will include 1) the Johnson & Johnson Defendants; 2) PTI Union; 3) Imerys; and 4) as to the *Barsh* Plaintiffs, Schnuck Markets. Similarly, the non-Missouri Class Three Plaintiffs shall separately refile their complaints under their own name and civil action number; however, in these complaints, the name defendants will only include 1) Imerys; and 2) PTI Union.

Dated: June 29, 2020                     /s/ Freda L. Wolfson
                                         FREDA L. WOLFSON
                                         U.S. CHIEF DISTRICT JUDGE